840 F.2d 876
 Mary B. CLARK, individually and as survivor-at-law of Ray
Sharp, a/k/a Willie Clark and Shirley Clark,
Administratrix of the Estate of Ray
Sharp, Plaintiffs- Appellees,
v.
David C. EVANS, et al., Defendants,
Lanson Newsome and Robert Coleman, Defendants-Appellants.
Mary B. CLARK, et al., Plaintiffs-Appellants,
v.
David C. EVANS, et al., Defendants-Appellees.
 Nos. 86-8685, 86-8878.
 United States Court of Appeals,
Eleventh Circuit.
 March 25, 1988.
 
 William F. Amideo, Staff Asst. Atty. Gen. Atlanta, Ga., for defendants-appellants.
 Kenneth L. Shigley, Van Gerpen & Rice, Atlanta, Ga., John P. Batson, Augusta, Ga., plaintiffs-appellees.
 John P. Batson, Augusta, Ga., Martha A. Miller, Atlanta, Ga., for plaintiffs-appellants.
 Kenneth L. Shigley, Atlanta, Ga., for defendant-appellee Cowart.
 Appeals from the United States District Court for the Southern District of Georgia.
 Before RONEY, Chief Judge, ANDERSON and EDMONDSON, Circuit Judges.
 ANDERSON, Circuit Judge:
 
 
 1
 This civil rights action arose when plaintiffs' decedent, Ray Sharp, was shot and killed while attempting to escape from Georgia State Prison at Reidsville. Plaintiffs Mary Clark and Shirley Clark (hereinafter "Clark") sued several defendants, as follows: Evans, the Commissioner of the Department of Corrections; Newsome, the Warden of the Georgia State Prison; Coleman, the guard in the tower who fatally shot Sharp; and Cowart, Oliver, Berry, Spell, Lewis, Lane and Todd, all guards who were on the yard or in the building complex when Sharp made his escape attempt. Plaintiffs sued under 42 U.S.C. Sec. 1983, claiming that the several defendants had violated Sharp's constitutional rights.
 
 
 2
 The district court granted summary judgment in favor of a first set of defendants--namely, Evans, Cowart, Oliver, Berry, Spell, Lewis, Lane, and Todd--and dismissed them from the case. However, the district court rejected the qualified immunity defense asserted by Newsome and Coleman in their individual capacities,[1] and ordered the case against these two defendants to proceed to trial. Newsome and Coleman brought an immediate appeal on the qualified immunity question. The plaintiffs also appealed the dismissal of the first set of defendants.[2]
 
 
 3
 We affirm the district court's grant of summary judgment as to the first set of defendants. With respect to all of plaintiffs' theories against both Coleman and Newsome, we conclude that their qualified immunity defense was valid, and thus we reverse with respect to Coleman and Newsome.
 
 I. FACTS
 
 4
 Sharp was a life sentence inmate in Georgia State Prison. Sharp suffered from paranoid schizophrenia and had delusions that the prison staff was trying to kill him. About two weeks prior to the incident which led to his death, Sharp received a committal order which obliged the prison to transfer him to a mental institution. The committal order was still being processed at the time of the incident.
 
 
 5
 Sharp's mental illness had previously led to problems at the prison. Once he seriously injured a guard with a mop wringer; this episode led to his involuntary commitment order. Twice he attempted to hang himself. One week prior to the fatal incident, Sharp made an escape attempt in which he tried to climb the interior fence,[3] but was caught and subdued by prison officials.
 
 
 6
 The incident which formed the basis for the instant lawsuit involved another escape attempt by Sharp. While he was in the exercise yard, Sharp began to behave strangely. Sharp ran to the interior fence and began climbing over it into the area known as "no man's land." Guards on the yard ran after him until Sharp climbed over the interior fence; they continued yelling at him to stop, but Sharp kept running. A guard in the closest tower, Officer Coleman, saw him attempting to climb over the perimeter fence, which was forty feet away from the tower. Two warning shots with shotguns were fired, and when Sharp got over the perimeter fence and began to run, Coleman shot him. Sharp died from his injuries and his relatives sued, claiming various theories of liability.
 
 II. BACKGROUND
 
 7
 Prior to the episode which led to the filing of this action, Georgia State Prison at Reidsville had been the subject of a class action lawsuit based on conditions in the prison. That case, Guthrie v. Evans, No. 3068 (S.D.Ga.1972), led to the filing of a remedial consent decree which ordered changes in many aspects of the prison. In relevant part, the Guthrie order dealt with such issues as use of force, security, training of officers, and medical and mental health treatment. Georgia State Prison thus operated under this consent decree and everyone who worked at the prison was familiar with and bound by its provisions.
 
 III. DEFENDANTS COLEMAN AND NEWSOME
 A. Qualified Immunity
 
 8
 Defendants Coleman and Newsome appeal the refusal of the district court to dismiss them from the case on the basis of their qualified immunity defense. This issue is immediately appealable, based on the authority of Mitchell v. Forsyth, 472 U.S. 511, 530, 105 S.Ct. 2806, 2817, 86 L.Ed.2d 411 (1985).
 
 
 9
 Defendants are entitled to qualified immunity if the law with respect to their actions was unclear at the time the cause of action arose. Mitchell, 472 U.S. at 530, 105 S.Ct. at 2818; Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1983). As the Supreme Court said in Harlow,
 
 
 10
 [G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.... If the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct.
 
 
 11
 Id. at 818-19, 102 S.Ct. at 2738. The Supreme Court, by adopting this test, has balanced the public interest in deterring unlawful conduct and compensating victims against the fairness of imposing liability only where officials had notice that their conduct was unlawful. On summary judgment, then, the judge must determine not only the currently applicable law but also whether that law was clearly established at the time the action arose. Harlow, 457 U.S. at 818, 102 S.Ct. at 2738.
 
 
 12
 Thus, our task with regard to each of plaintiffs' theories of liability is to determine the clarity of the law at the time Sharp was shot. Defendant Coleman, the officer who fatally shot Sharp, was sued on theories that he violated Sharp's Eighth and Fourteenth Amendment rights in three ways: (1) by using deadly force; (2) by failing to use disabling force prior to using deadly force; and (3) by using deadly force against someone who was mentally ill. Defendant Newsome, the warden of the prison, was sued: (1) on a respondeat superior theory with respect to the deadly force issue; (2) on the theory that the training his staff received was inadequate because they were not trained to shoot to disable; and (3) on the theory that security at the prison was inadequate and allowed incidents like this to happen. Thus, we must inquire about the law regarding the use of deadly force and the law regarding prison security measures.
 
 B. Law Regarding Use of Deadly Force
 
 13
 Plaintiffs argue that Tennessee v. Garner, 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985), clearly establishes the law that the use of deadly force has constitutional limits. Although plaintiffs acknowledge that the Garner opinion was published after the incident here, they argue that the Guthrie order placed these defendants on notice of and clearly established the applicable constitutional principle. The portion of the Guthrie order relied upon by plaintiffs reads as follows:
 
 
 14
 An officer may discharge a firearm or taser under the following circumstances: ... at an escaping inmate, if the escape is actually in progress and cannot be reasonably prevented in a less violent manner.
 
 
 15
 Georgia State Prison Use of Force Policy Statement 515.1, activated October 8, 1982, p. 4; adopted as order in Guthrie on June 16, 1983.
 
 
 16
 For purposes of this opinion, we assume arguendo, without deciding, that the Guthrie order above quoted properly articulates the applicable constitutional principle and that it was clearly established at the time of the incident.[4] However, plaintiffs' argument nevertheless fails because "a reasonable officer could have believed ... [Coleman's actions] to be lawful, in light of clearly established law and the information ... [Coleman] possessed." Anderson v. Creighton, --- U.S. ----, ----, 107 S.Ct. 3034, 3040, 97 L.Ed.2d 523 (1987).
 
 
 17
 We examine the information available to the reasonable officer in Coleman's shoes. Coleman knew that Sharp was housed in Building M which was a maximum security area designed to house the most violent and dangerous inmates. Coleman recognized Sharp at the time of the incident. He knew about the previous incident involving a serious assault by Sharp on a correctional officer with a mop wringer. He knew about the previous escape attempt by Sharp.
 
 
 18
 With respect to the escape attempt itself, Coleman saw Sharp climb over the interior fence, run across the approximately 20 feet of "no man's land," climb up the perimeter fence and jump down into the open land which separates the prison from the wooded area approximately 60 yards from the perimeter fence. While Sharp was climbing over the fences, numerous guards and inmates inside the fence were calling to Sharp to stop, as was Coleman himself. Also, two warning shots were fired. After Sharp cleared the perimeter fence, jumped down to the ground outside the prison, and started to escape, Coleman fired the fatal shot.
 
 
 19
 The only other relevantly placed guard was Prescott. At the time the attempted escape commenced, Prescott was sitting in a white van outside the perimeter fence, some distance away from the point where Sharp scaled the fence. When Prescott saw Sharp start climbing up the perimeter fence, he cranked his van, drove on the road, and parked on the shoulder of the road. Prescott testified that the distance from the tower on which Coleman was posted to the perimeter fence where Sharp jumped over was approximately 25 feet, and that Prescott parked his car about the same distance behind Tower 3. Prescott testified that Sharp was at the top of the perimeter fence at the time Prescott pulled up and parked on the shoulder of the road. Prescott got out of his car, pulled out his revolver, hollered at Sharp, heard one of the warning shots, and saw Sharp land on the ground outside the perimeter fence, get up and make a motion like he was starting to take a step or run. Prescott aimed his pistol at Sharp and about that time Coleman fired the fatal shot.
 
 
 20
 The district court noted that it was unclear whether Prescott was in a position so that he could have subdued Sharp with "hands on force," thus avoiding the necessity of shooting. On that basis, the district court concluded that there was a genuine issue of fact relevant to the determination of whether Sharp's escape could reasonably have been prevented in a manner less violent than shooting.
 
 
 21
 We conclude that the district court asked the wrong question. The proper inquiry, under Anderson v. Creighton,[5] is "the objective (albeit fact-specific) question whether a reasonable officer could have believed ... [Coleman's actions] to be lawful, in light of clearly established law and the information ... [Coleman] possessed." --- U.S. at ----, 107 S.Ct. at 3040. The Supreme Court:
 
 
 22
 recognized that it is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and we have indicated that in such cases those officers--like other officials who act in ways they reasonably believe to be lawful--should not be held personally liable.
 
 
 23
 Id. at ----, 107 S.Ct. at 3039. In other words, the proper question is not whether in fact the escape could reasonably have been prevented in a less violent manner; rather, the issue is whether a reasonable officer with the information available to Coleman could have believed that less violent means were not reasonably available. In other words, could a reasonable officer under these circumstances have believed it was lawful to shoot rather than permitting Sharp to proceed in reliance upon the ability of Prescott to subdue Sharp without using deadly force?[6] We have no hesitation in concluding that a reasonable officer could have believed that Coleman's actions were lawful. Under these circumstances it was objectively reasonable to believe that the escape could not be reasonably prevented in a less violent manner. We believe that this is precisely the kind of case contemplated in Anderson v. Creighton in which the qualified immunity defense should prevail.
 
 
 24
 Thus, the district court erred in rejecting Coleman's qualified immunity defense. It follows that Newsome, the prison warden, is also entitled to qualified immunity.[7]
 
 C. The Law Regarding Use of Disabling Force
 
 25
 Plaintiffs further argue that Coleman had a duty to shoot to disable Sharp rather than to kill him. Of course, Coleman did fire warning shots, but plaintiffs argue that he then should have fired to disable (e.g., at the legs) before firing to kill him. Similarly, plaintiffs argue that Newsome had a duty to train his officers to shoot to maim rather than to shoot to kill. We need not decide whether such a duty exists or is constitutionally mandated; rather, our sole inquiry is whether the law at the time of the shooting clearly established a requirement of firing disabling shots prior to deadly shots.
 
 
 26
 We cannot say that the law clearly establishes a duty to use disabling force prior to using deadly force. No case has expressly held that an officer has to first shoot to maim before shooting to kill. Nor have those cases which have dealt with the use of deadly force in fleeing felon situations even distinguished between deadly force and disabling force. See, e.g., Tennessee v. Garner, 471 U.S. at 8-12, 105 S.Ct. at 1700-01; Pruitt v. City of Montgomery, 771 F.2d 1475, 1479 n. 10 (11th Cir.1985); Acoff v. Abston, 762 F.2d 1543 (11th Cir.1985). Similarly, the Guthrie order is silent with regard to use of disabling force. Neither defendant was put on notice that not shooting to disable would subject him to liability. Since the law on this point was not clearly established at the time Sharp was shot, defendants Coleman and Newsome can properly claim a defense of qualified immunity as against the disabling force theory of liability.
 
 D. Use of Force on Mentally Ill Inmates
 
 27
 Another of plaintiffs' theories of liability against Coleman and Newsome involves the use of force when a mentally ill inmate is involved. There are two prongs to plaintiffs' argument: (1) the law forbids the execution of insane persons; and (2) deadly force cannot be used when an inmate is trying to commit suicide. This line of argument is creative but has no merit.
 
 
 28
 While it is true that the law clearly establishes a prohibition against executing the insane, Ford v. Wainwright, 477 U.S. 399, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986), Sharp's death hardly amounts to an execution. He was not shot and killed as punishment for a crime he had committed; rather, he was shot in order to stop an escape attempt. Since there is no clearly-established law regarding whether an insane person can be shot during an escape attempt, defendants can appropriately raise a qualified immunity defense.
 
 
 29
 As for the theory that Sharp's action amounted to a suicide attempt and the use of deadly force was therefore prohibited, this argument must also fail. It is true that the Guthrie order and the Georgia State Prison Use of Force Policy Statement state that "[u]nder no circumstances may deadly force be used to stop or prevent an inmate from injuring himself." Georgia State Prison Use of Force Policy Statement 515.1, activated October 8, 1982, p. 5; adopted as order in Guthrie on June 16, 1983. It may also be the case that Sharp's actions were so futile and foolhardy that death or injury was a likely result. But there is a distinction between Sharp's actions in climbing over the fence and his suicide attempts when he attempted to hang himself, not unlike the difference between a Kamikaze pilot and someone who takes an overdose of drugs. One action, though ultimately suicidal, carries with it the risk of danger to others. Sharp's escape attempt, regardless of the motivations, presented a risk to members of the community outside the prison. Defendant Coleman was charged with the duty of preventing such risks. From his point of view, therefore, Sharp's mental state was fairly irrelevant. In any event, the Guthrie order on this point does not deal with the specific situation of escaping mentally ill inmates, which presents conflicting duties as laid out above. We conclude that the law on this point is unclear, and Coleman and Newsome again have a qualified immunity defense against this theory of disability.
 
 E. Security Measures
 
 30
 Turning to plaintiffs' final theory of liability against defendant Newsome, we must examine whether Newsome can raise a qualified immunity defense against the claim that security measures at the prison were inadequate. Plaintiffs allege that there are three ways in which security at Georgia State Prison was inadequate at the time of the shooting. One, the perimeter fence of the institution, over which Sharp had just climbed when he was shot, was decrepit, too low, and lacking an alarm system. Two, the keys to the gate of the perimeter fence were not kept in an easily-accessible location, thus preventing the guards who ran after Sharp from capturing him without use of force. Three, the one roving perimeter patrol guard on the outside of the fence was unable to handle escape situations like this because he had too many duties unrelated to perimeter security that took him away from the vulnerable area near the fence.
 
 
 31
 We have carefully reviewed the provisions of the several Guthrie orders relating to each of the three security measures alleged to be inadequate. Although each is discussed, we find nothing sufficient to place defendant Newsome on notice that at the time of Sharp's death the status of the fence, the key system or the roving patrol would violate Sharp's constitutional rights. Accordingly, Newsome is entitled to qualified immunity.
 
 F. Claims Asserted Under Guthrie v. Evans
 
 32
 Plaintiffs assert yet another basis for their lawsuit against defendant Newsome:[8] that Sharp's rights under Guthrie v. Evans were denied without due process and that this creates an independent basis for Sec. 1983 liability. The Fifth Circuit, in Green v. McKaskle, 788 F.2d 1116 (5th Cir.1986), concluded that "remedial decrees are the means by which unconstitutional conditions are corrected but ... they do not create or enlarge constitutional rights." Id. at 1123. The court reasoned that because the remedial device of contempt is in place to ensure the enforcement of court orders, there "is no need to allow court orders to serve as the basis of Sec. 1983 liability." Id. The Green court also addressed policy considerations underlying its conclusion. Despite the fact that Green is squarely on point, we need not decide the issue of whether the Guthrie remedial order in fact created substantive constitutional rights, in addition to enforceable rights, in light of our discussion in the sections above. With regard to the alleged violation of the Guthrie order limiting the use of deadly force, we held in Section III.B. that a reasonable officer in Coleman's shoes could have believed his actions were lawful under the Guthrie order. We thus held that both Coleman and Newsome were entitled to qualified immunity. With regard to each of the other alleged violations of Guthrie by Newsome, we held in the sections above that Newsome was entitled to qualified immunity because neither the Guthrie order nor any other source clearly established that there would be a violation of constitutional rights. Having already held that Newsome has not violated any clearly-established precept of Guthrie, plaintiffs' argument in this section must fail.
 
 IV. DEFENDANT EVANS
 
 33
 Defendant Evans, the Commissioner of the Georgia Department of Corrections, was sued by plaintiffs on an entirely different theory than those discussed above. Plaintiffs argue that there was a policy, instituted and perpetuated by Evans, that committal orders of state court judges would be ignored. Two weeks before his death, Sharp had been involuntarily committed. Plaintiffs assert that Sharp's death occurred as a direct result of Sharp's not having been transferred to a mental hospital pursuant to the committal order.
 
 
 34
 If a policy of refusing to comply with committal orders in fact exists, the Constitution might be implicated. The Supreme Court has held that "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' ... proscribed by the Eighth Amendment." Estelle v. Gamble, 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976). See also Ramos v. Lamm, 639 F.2d 559, 575 (10th Cir.1980), cert. denied, 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 239 (1981); Ruiz v. Estelle, 503 F.Supp. 1265, 1332-40 (S.D.Tex.1980), aff'd in part and rev'd in part on other grounds, 679 F.2d 1115 (5th Cir.1982). However, though the allegations made by plaintiffs are troubling, we do not think that they are sufficient to establish liability on the part of defendant Evans.
 
 
 35
 The facts supporting plaintiffs' claims are as follows. In August 1984, Sharp assaulted and seriously injured a correctional officer by striking him with a mop wringer. As a result of that attack, charges were brought against Sharp. Prior to trial, Judge Cavender appointed a psychiatrist, Dr. William Miles, to determine whether Sharp was competent to stand trial. Dr. Miles examined Sharp in January 1985, and in his February 5, 1985, report, Dr. Miles found Sharp mentally ill and incompetent to stand trial. On May 20, 1985, Judge Cavender conducted a competency hearing. At the conclusion of the hearing, the judge declared Sharp incompetent to stand trial and directed that Sharp be transferred to Central State Hospital for treatment of his mental condition. The transfer order was filed on May 28, 1985. Because all orders for the transfer of inmates from Georgia Department of Corrections must come from the Department's Atlanta headquarters, Judge Cavender's transfer order was sent to Atlanta.
 
 
 36
 Frances Smith is the Department's employee responsible for processing such court orders affecting Georgia State Prison inmates. In her deposition, Smith testified that she knew from previous experience that committal orders were of questionable validity due to a 1970 Attorney General Opinion Letter. That Opinion Letter reasons that because the committal order of one judge necessarily interferes with the running of a sentence imposed by another judge, compliance with the committal order would be in violation of Georgia law. Smith testified that her usual procedure upon receiving a committal order is to contact the Attorney General's Office to inquire about the status of the 1970 Opinion Letter. If Smith finds, as she always has, that the Opinion Letter is still in effect, then Smith telephones the clerk's office in the county where the commitment order was entered and advises them that the department is "not going to be able to comply with the order." Smith deposition at 9. After that telephone call, Smith places the order in the inmate's file and takes no further steps. Id. at 10. In Smith's experience, the Department has never transferred an inmate to Central State Hospital as a result of a state court's order to commit the inmate. In the four years she had worked in this capacity, Smith had received four or five such orders, all of which had been handled in the same manner. With specific regard to Sharp's committal order, Smith contacted Daryl Robinson of the Attorney General's Office on June 7, 1985, for assistance in dealing with the transfer order. Robinson indicated that he would check into the matter and get back to her on Monday, June 10. However, on June 9, Sharp made his fatal escape attempt.
 
 
 37
 The district court concluded that the requisite causal connection was lacking between Sharp's death and the department's failure to process the committal order. We need not reach this causation issue, because plaintiffs' claim must fail for the following reason. Plaintiffs do not allege that defendant Evans knew about a policy of disregarding committal orders, if such a policy even existed. Indeed, there is undisputed evidence that Evans did not know. See Deposition of Evans at 11-21. Only Smith testified that she knew of and acted pursuant to such a policy, and she is not a defendant in this case. Of course, Evans cannot be liable on a respondeat superior theory. He might be liable if a history of widespread abuses put him on notice of the need for improved training or supervision, and he failed to take action. Fundiller, 777 F.2d at 1443; Wilson v. Attaway, 757 F.2d 1227, 1241 (11th Cir.1985). However, it is clear that four cases in four years would have been insufficient to put Evans on notice, especially since the record is clear that such matters were handled at lower administrative levels and would not have come to the attention of Evans.[9]
 
 
 38
 Thus, we affirm the district court's dismissal of defendant Evans on this theory of liability.
 
 
 39
 V. DEFENDANTS COWART, OLIVER, BERRY, SPELL, LEWIS, LANE AND TODD
 
 
 40
 Finally, plaintiffs appeal the summary judgment granted to defendants Cowart, Oliver, Berry, Spell, Lewis, Lane and Todd. These defendants were, at the time of the shooting, guards stationed either on the recreation yard near Sharp or nearby in the building complex. The district court concluded that the facts did not support a conclusion that these defendants were deliberately indifferent to Sharp's safety or serious medical needs. We agree.
 
 
 41
 On the day of the escape attempt, Cowart was the first to notice Sharp climbing the interior fence and he shouted to the other officers. Berry, who was stationed in the hallway, let himself and the other officers into recreation pen three. The officers attempted to pull Sharp off the fence, but they were unable to reach him because "[e]very time [they would] try to jump to get him, [he would] raise his foot up." Deposition of Ronnie Berry at 22. Because the keys to the gate were in the tower, the guards' sole means of exiting the pen was to scale the twelve-foot interior razor-topped fence.
 
 
 42
 In Estelle v. Gamble, 429 U.S. at 103-04, 97 S.Ct. at 290-91, the Supreme Court held that the state owes a duty of care to inmates for whom it is responsible; however, the Constitution was implicated only in cases where an inmate can show "deliberate indifference" to a serious medical need. Plaintiffs seem to contend that because Sharp was mentally ill, defendants had an absolute duty to do all they could to prevent Sharp from bringing harm upon himself. That duty, plaintiffs assert, includes climbing over razor-covered fences. We agree with the district court that this argument is frivolous; the Eighth Amendment duty of care clearly does not stretch so far. Plaintiffs also argued that the guards should have communicated to Officer Coleman in the guard tower that Sharp was mentally ill and should not be shot. Regardless of whether such a communication would have been a good idea, at most the failure to make such a communication would have been negligent and not an example of deliberate indifference to Sharp's needs. Thus, under the facts of this case, we hold that the actions of defendants Cowart, Oliver, Berry, Spell, Lewis, Lane and Todd do not constitute deliberate indifference to Sharp's mental problems.
 
 VI. CONCLUSION
 
 43
 The district court properly granted summary judgment to defendants Evans, Cowart, Oliver, Berry, Spell, Lewis, Lane and Todd and we affirm the judgment of the district court in this regard.
 
 
 44
 However, the district improperly rejected the qualified immunity defenses of defendants Coleman and Newsome. With respect to all of plaintiffs' theories of liability against both Coleman and Newsome, we conclude that their qualified immunity defense was valid. Thus we reverse as to Coleman and Newsome.
 
 The judgment of the district court is
 
 45
 AFFIRMED in part, REVERSED in part, and REMANDED.
 
 
 
 [1]
 The district court dismissed all claims against all defendants in their official capacities, and plaintiffs' challenge to this ruling is foreclosed by Supreme Court precedent
 
 
 [2]
 The issues raised in this appeal were certified pursuant to 28 U.S.C. Sec. 1292(b)
 
 
 [3]
 A description of the physical layout of the prison is important to an understanding of the facts of this case. In the recreation area, there are seven recreation pens. The back fence of the recreation pens comprises part of the perimeter security. Perimeter security consists of two fences. The first fence ("interior fence") separates the recreation pens from a barren piece of land which is approximately twenty feet wide and is referred to as "no man's land." The second fence ("perimeter fence") surrounds "no man's land," separating it from the unenclosed land surrounding the prison. The characteristics of the fences are hotly contested by the parties. The interior fence is approximately twelve feet high and the perimeter fence is approximately nine feet high. The interior fence is topped with concertina razor wire and the perimeter fence with barbed wire. Due to the poor condition of the fences, however, the extent to which either fence constitutes an imposing structure is subject to dispute
 There is a gate on each fence. The gate on the interior fence is located in recreation pen three and the gate on the exterior fence is directly across from the gate on the interior fence. For security purposes, the keys to the gates are kept in guard towers located outside the perimeter fence. There are two guard towers outside the perimeter fence adjacent to the complex where Sharp was housed. The towers have armed correctional officers on guard at all times. Surrounding the towers is approximately sixty yards of open land. At the edge of the open land is a wooded area and beyond that there is a perimeter road patrolled by an armed correctional officer, known as the roving patrol. There is no radio contact between the tower and the road patrolman.
 
 
 [4]
 Thus we are assuming, but expressly not deciding, several principles. First, we are assuming that the portion of the Guthrie order quoted in the text accurately articulates the principle of law relating to the use of deadly force which was later articulated and clearly established in Tennessee v. Garner. Second, we are assuming that the Garner principle of law, which was announced in the context of the seizure of a felony suspect and the Fourth Amendment ramifications thereof, applies with equal force and would also clearly establish the law in the different context of a prison escape and the Eighth Amendment ramifications thereof. Third, we are assuming that the above-quoted Guthrie order could serve to anticipate the Garner constitutional principle and to place defendants on notice of that principle as a clearly established constitutional principle. Cf. Williams v. Bennett, 689 F.2d 1370, 1385-86 (11th Cir.1982), cert. denied, 464 U.S. 932, 104 S.Ct. 335, 78 L.Ed.2d 305 (1983). Because of our disposition of this case as explained in the text below, we need not address or decide any of these issues, and we expressly do not do so
 
 
 [5]
 The district court did not have the benefit of the Supreme Court's reasoning in Anderson v. Creighton, since it was published after the district court decision in this case
 
 
 [6]
 The foregoing recitation of facts attempts to draw all reasonable inferences in plaintiffs' favor, as required by the current summary judgment posture of this case. We note that the district court indicated that it was not clear whether Sharp began running to escape after clearing the perimeter fence, or merely began "walking." Whether Sharp began to run after clearing the final fence, or began to walk, a fair reading of the depositions clearly indicates that Sharp continued at that point to disregard all of the warnings including the warning shots, and was continuing his escape attempt. The district court also indicated that Prescott's precise location was unclear and that this was relevant to a determination of whether Prescott would have been able to subdue Sharp with "hands on force" instead of shooting. However, Prescott's precise location is not relevant to our decision (e.g., whether he was approximately 50 feet from Sharp as Prescott estimated, or more or less), nor is the fact that he might have been able to subdue Sharp with "hands on force." Rather, our conclusion is that a reasonable officer with the information available to Coleman could reasonably have believed that his actions were lawful, i.e., that it was not legally necessary to rely upon the ability of Prescott to subdue Sharp with "hands on force."
 
 
 [7]
 We note in addition that Newsome's liability in any event would be derivative and that a Sec. 1983 action cannot be sustained solely on a theory of respondeat superior. Fundiller v. City of Cooper City, 777 F.2d 1436, 1443 (11th Cir.1985)
 
 
 [8]
 Plaintiffs also assert this claim as against defendant Evans, the Commissioner of the Georgia Prison System. For reasons to be discussed in Section IV below, this argument fails simply because the facts do not support a conclusion that Evans' actions were actionable
 
 
 [9]
 Nothing said herein indicates our approval of the procedures by which committal orders for inmates were processed. Rather, the undisputed facts do not support a conclusion that defendant Evans could be liable for a policy of ignoring committal orders