Jose Vasquez **ISQUIERDO**, Plaintiff,

v.

William Joseph **FREDERICK and Gregory Marshall Cox in their individual capacities, Defendants.**

No. 1:94CV00689.

United States District Court,
M.D. North Carolina,
Durham Division.

April 22, 1996.

Katherine E. Jean and William Webb Plyler, McMillan, Smith & Plyler, Raleigh, NC, for plaintiff, Jose Vasquez Isquierdo.

Tyrus Vance Dahl, Jr. and Ursula Marie Henninger, Womble Carlyle Sandridge & Rice, Winston–Salem, NC, for defendants William Joseph Frederick, and Gregory Marshall Cox.

Jimmy Lewis Love, Love & Wicker, Sanford, NC, for City of Sanford and Sanford Police Dept.

## MEMORANDUM OPINION

SHARP, United States Magistrate Judge.

Plaintiff Jose Vasquez Isquierdo brought this action pursuant to 42 U.S.C. § 1983, alleging that Defendants William Joseph Frederick and Gregory Marshall Cox, officers of the Sanford Police Department, used excessive force against him in violation of his rights under the Fourth Amendment when they shot him during the night of November 26–27, 1993. Isquierdo has also stated pendent state law claims based upon alleged

negligence, gross negligence, and assault and battery.

In his Amended Complaint, Isquierdo alleges that the shooting occurred in the late evening hours of November 26, 1993, just before midnight. Isquierdo had been outside his house, firing a pistol in the air. He went inside his house and fired more shots. He went into the bedroom where his girlfriend, Linda Polito, and two small children were, and fired additional shots into the ceiling. According to the complaint, Isquierdo hugged his children and started to walk toward the bedroom door to put his gun away. At that moment, Officers Frederick and Cox were outside the bedroom window, their presence unknown to Isquierdo and the other occupants of the bedroom. Officer Cox shot at Isquierdo twice. Plaintiff was uncertain whether Officer Frederick also fired a shot although Frederick maintains that he fired one shot and Cox fired two.

In their Answer, Frederick and Cox admit that Frederick instructed Cox to "take him out," meaning to shoot the Plaintiff, "if defendant Cox could get a clear shot without endangering the hostages." (Answer, ¶ 44.) Defendants admit that Cox fired two shots at the Plaintiff, and also allege that Frederick fired one shot. Defendants deny that they used excessive force upon the Plaintiff or otherwise violated his rights, and maintain affirmative defenses of qualified immunity and police officer immunity.

*Summary judgment record*

The court will summarize the evidence in the summary judgment record, recognizing that some factual disputes exist.

Around midnight on November 26–27, 1993, Jose Isquierdo took a handgun from his kitchen cabinet, loaded it, and went outside his home in Sanford and fired it into the air repeatedly. (Isquierdo dep. at 69–71.) He had been drinking beer for much of the day. (*Id.* at 56–65.) He did not know how many shots he fired, but he emptied a clip that holds six cartridges, and then reloaded and fired more shots. Isquierdo went back inside and sat in his living room. He listened to music and reloaded his pistol. He left the living room and fired some shots into the

floor near the laundry room. (*Id.* at 74.) Isquierdo then went into the bedroom where Linda Polito and two children were. He avers that he meant to tell them he was sorry for the shooting. (*Id.* at 76.) He knew that they were scared and were crying. (*Id.* at 76–77.) Once inside the bedroom, Isquierdo fired the gun several times toward the ceiling of the bedroom. (*Id.* at 77–80.) The children were crying aloud. After shooting into the ceiling, Isquierdo (according to his deposition testimony) put down the gun, got down on his knees, and talked in Spanish to Polito and the children who were on the bed. (*Id.* at 80–81.) Isquierdo then got up with the gun in his left hand, heard shots, and fell to the floor. He did not remember anything after the shooting. (*Id.* at 81.) On deposition, Isquierdo initially denied ever telling the children to shut up, but later testified that he does not remember. (*Id.* at 83, 84.) He also testified that his gun was never close to the head of either of his children, and he never verbally threatened to kill Polito or the children. (*Id.* at 84.)

Linda Polito avers that she and the two children were in bed on November 26, 1993, when Isquierdo come home between 11 and 11:30 p.m. (Polito dep. at 53.) The sound of Spanish music woke her. At about midnight, Isquierdo came into the bedroom and took the children to show them to visitors who were with him in the living room. (*Id.* at 55.) The children, ages two and three, returned to the bedroom and got back in bed with Polito. Shortly thereafter, Polito heard gunshots outside the house, and saw people driving away in a black and white truck. (*Id.* at 59.) Polito then heard more shots. She left the bedroom and saw Isquierdo in the living room with a gun. She told Isquierdo, who was drunk, to stop the shooting. (*Id.* at 60.) Isquierdo did not reply and Polito returned to the bedroom to the children. Within a few minutes, she heard shots being fired inside the house. (*Id.* at 61.) Polito stayed in the bedroom with the children who were crying (not because of the gunshots, Polito testified). Isquierdo then came into the bedroom. Polito did not say anything to him. Isquierdo began to fire shots into the ceiling. The lights were on, and Polito was holding onto

the children who were crying but not screaming. (*Id.* at 64.) Isquierdo then came over to the bed and leaned across the bed, talking to the children in Spanish. (*Id.* at 65.) At that time, the gun was still in his right hand, according to Polito's testimony. (*Id.*) The gun was several inches from Polito's head but was not pointed at her. (*Id.*) Polito avers that Isquierdo never told her or the children to shut up. After Isquierdo finished talking to the children, he got up with the gun in his left hand, turned and headed for the door of the bedroom. Polito did not say anything to Isquierdo while he was in the bedroom, but may have said something to the children. Polito testified that "it happened so fast who had—I didn't have time to say nothing." (*Id.* at 69.) As Isquierdo headed toward the door, Polito heard shots and Isquierdo fell to the floor. (*Id.* at 72.) The police then came into the residence.

The Defendants' accounts of the events in question are consistent in many respects, but not all respects, with those of Isquierdo and Polito. At approximately midnight on November 26, 1993, Frederick and Cox heard gunfire, and the Sanford Police Department dispatched officers to investigate reports of gunfire in the area around Isquierdo's home. (Frederick dep. at 12; Cox dep. at 21.) Frederick heard more gunshots while en route. Upon arriving near the scene, the officers heard gunfire coming from inside the house at 401 Oakwood Avenue. While other officers set up a perimeter around the house, Frederick and Cox ran to a tree near a bedroom window. The curtains were drawn, but there was a small pie-shaped opening in the curtains that was about three inches across at the base of the window. (Frederick dep. at 22, 87, 132.) Both Frederick and Cox testified on deposition that through the window they saw Isquierdo yelling at Polito and the children, and threatening to kill them if they didn't shut up. Isquierdo was waving a gun in his left hand and hollering. (Frederick dep. at 23.)

Some of Isquierdo's words were in Spanish, some in English. Each officer viewed the situation for "just seconds." (Frederick dep. at 24.) Frederick heard babies crying. At one point when Frederick looked in, Isquierdo was lying on the bed with his gun near a child's head. (Frederick dep. at 36.) Again, Frederick's view lasted only a matter of seconds.

Frederick radioed the dispatcher to send all available cars to the area to deal with a possible hostage situation. (Frederick dep. at 26.) While crouching below the bedroom window, Frederick and Cox discussed knocking on the door and other strategies to resolve the situation. In the middle of this discussion, shots rang out from the bedroom. (*Id.* at 29.) The officers went to the ground and determined that neither had been struck by a bullet. Frederick then told Cox that if he had a chance, "take him out." (Frederick dep. at 32.) Frederick and Cox rose to a firing position. Cox testified that the last thing he saw before sighting his weapon and firing twice was Isquierdo standing at the foot of the bed, holding the gun. (Cox dep. at 36–37.) Frederick testified that he fired once at Isquierdo at the same instant. (Frederick dep. at 65.) Two shots hit Isquierdo in the back. (Cox dep. at 61.) After the incident, hospital tests showed that Isquierdo's blood-alcohol content was .328.

Patrolman Ernest Hall, Sanford Police Department, testified on deposition regarding the events of the night of November 26–27, 1993 at the Plaintiff's residence. Hall arrived at the scene and was told by another officer (Frazier) that a female and juveniles were being held in the bedroom. Hall took a position so that he could see the front and east sides of the residence. He saw Cox and Frederick at the window, and then he heard two or three shots come from inside the bedroom. (Hall dep. at 36.) Cox and Frederick fell to below window height and took cover in the bushes or tree line directly behind them. Hall then saw Cox fire twice into the bedroom window, but did not see Frederick at that moment and did not know where he was. (Hall dep. at 38.) On cross-examination, Hall said that Frederick could have fired a shot, but he did not see him at the time he heard shots fired. Frederick could have been on the other side of Cox, blocking Hall's view of him. (Hall dep. at 85.)

### Summary judgment standard

■ The Defendants have joined in a motion for summary judgment. A party is entitled to judgment as a matter of law upon a showing that "there is no genuine issue of material fact." Fed.R.Civ.P. 56(c). The material facts are those identified by controlling law as essential elements of claims asserted by the parties. A genuine issue as to such facts exists if the evidence forecast is sufficient for a reasonable trier of fact to find for the nonmoving party. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). No genuine issue of material fact exists if the nonmoving party fails to make a sufficient showing on an essential element of its case as to which it would have the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986).

■ In evaluating a forecast of evidence on summary judgment review, the court must view the facts and inferences reasonably to be drawn from them in the light most favorable to the nonmoving party. The nonmoving party cannot get its case to the jury "by merely asserting that the jury might . . . disbelieve the [moving party]." *Anderson v. Liberty Lobby*, 477 U.S. at 256, 106 S.Ct. at 2514. This is true even where the evidence is likely to be within the possession of the moving party, as long as the nonmoving party has had a full opportunity to conduct discovery. *Id.* at 257, 106 S.Ct. at 2514–15. In ruling on a summary judgment motion, the court may not weigh conflicting evidence or resolve disputed facts. *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 364 (4th Cir.1985).

### Discussion

The general rule regarding qualified immunity, as articulated in *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982), is that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." The purpose of quali-

fied immunity is to "remove most civil liability actions, except those where the official clearly broke the law, from the legal process well in advance of the submission of facts to a jury." *Slattery v. Rizzo*, 939 F.2d 213, 216 (4th Cir.1991).

■ In cases involving allegations of excessive force in violation of the Fourth Amendment, a police officer is entitled to qualified immunity if " '[a] reasonable officer could have believed . . . [his actions] to be lawful, in light of clearly established law and the information [he] possessed.' " *Clark v. Evans*, 840 F.2d 876, 881 (11th Cir.1988), quoting *Anderson v. Creighton*, 483 U.S. 635, 641, 107 S.Ct. 3034, 3040, 97 L.Ed.2d 523 (1987). The United States Supreme Court has stated that, in determining whether a reasonable officer "could have believed" his actions were lawful, a court should take the following into account:

> Because "the test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application," . . . its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses as an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight. . . . The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. . . . The calculus of reasonableness must embody allowance of the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.

*Graham v. Connor*, 490 U.S. 386, 396–7, 109 S.Ct. 1865, 1872, 104 L.Ed.2d 443 (1989).

■ The Constitution limits a police officer's resort to deadly force. An officer may use deadly force to prevent escape only when there is probable cause to believe that the suspect poses a serious threat of physical harm to the officer or others. *Tennessee v.*

*Garner,* 471 U.S. 1, 11, 105 S.Ct. 1694, 1701, 85 L.Ed.2d 1 (1985); *see also Slattery v. Rizzo,* 939 F.2d 213, 216 (4th Cir.1991) (holding that qualified immunity shields the defendant if a reasonable officer could have had probable cause to believe that the suspect posed a serious threat of physical harm at the moment the defendant pulled the trigger). However, in deadly force cases, the Supreme Court has distinguished between arguable errors in judgment, which are protected, and situations where there was no probable basis to believe that deadly force was justified. *Whitley v. Albers,* 475 U.S. 312, 323, 106 S.Ct. 1078, 1086, 89 L.Ed.2d 251 (1986).

The Fourth Circuit recently clarified the qualified immunity defense in *Slattery v. Rizzo.* In *Slattery,* a police officer shot the plaintiff in the face, believing under the circumstances before him that the plaintiff may have had a gun in his hand (instead of the beer bottle he actually held) as he sat in a car and turned toward the officer. The Fourth Circuit reviewed the applicable principles of qualified immunity and applied them in this manner:

> Government officials performing discretionary functions are shielded from civil liability to the extent their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). Qualified immunity protects all such officials unless the law clearly prohibited the action taken. *Mitchell v. Forsyth,* 472 U.S. 511, 530, 105 S.Ct. 2806, 2817, 86 L.Ed.2d 411 (1985).
>
> At the time this incident occurred, the Supreme Court had held that the Fourth Amendment limited a police officer's use of deadly force to those situations, among others, where he has probable cause to believe that a suspect poses a threat of serious physical harm to the officer or others. *Tennessee v. Garner,* 471 U.S. 1, 11, 105 S.Ct. 1694, 1701, 85 L.Ed.2d 1 (1985). This is the general right that the appellant was alleged to have abused. For the purpose of determining whether a defendant is entitled to qualified immunity the plaintiff's rights must be clearly established under the particular circumstances confronting the official at the time of the questioned action. *See Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). The right of the plaintiff must be established so clearly that a reasonable official would know what he is doing violates that right. *Ibid.* Where there is a legitimate question as to whether the officer's conduct would objectively violate the plaintiff's right, qualified immunity "gives police officers the necessary latitude to pursue their [duties] without having to anticipate, on the pain of civil liability, future refinements or clarifications of constitutional law." *Tarantino v. Baker,* 825 F.2d 772 (4th Cir.1987).
>
> The appellee argues that the primary question in determining the issue of qualified immunity is whether Rizzo in the eyes of a reasonable policeman, acted reasonably in shooting Slattery, and that such an issue is best resolved by a jury. That issue reaches the merits of the case, but qualified immunity affords government officials greater protection than a simple defense on the merits. *See Mitchell,* 472 U.S. at 526, 105 S.Ct. at 2815. Furthermore, the purpose of qualified immunity is to remove most civil liability actions, except those where the official clearly broke the law, from the legal process well in advance of the submission of facts to a jury. *Ibid.* A police officer should prevail on an assertion of qualified immunity if a reasonable officer possessing the same information could have believed that his conduct was lawful. *Anderson,* 483 U.S. at 641, 107 S.Ct. at 3039. If a reasonable officer could have found probable cause to believe that Slattery presented a serious threat of personal harm at the time that Rizzo pulled the trigger, then as a matter of law, the appellant is entitled to qualified immunity.

939 F.2d at 216–17.

 It is elementary that this court cannot resolve disputed issues of fact during a summary judgment review. There are sev-

eral factual disputes in this case, including whether Isquierdo verbally threatened Polito and the children, whether Isquierdo pointed his gun directly at Polito or the children, whether Defendant Frederick fired his gun at all during the incident, and whether Isquierdo was facing the bed in the seconds or split-seconds before he was shot or had begun walking toward the doorway out of the room. Nonetheless, it is Defendants' position that these factual disputes are immaterial because a reasonable officer could have believed that Isquierdo posed a serious and immediate threat to the safety of others at the time Officers Cox and Frederick (or only Cox) fired upon Isquierdo. After careful consideration, the court agrees that this is so. Qualified immunity shields law enforcement officers from liability except where an officer *clearly broke the law. Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 2815, 86 L.Ed.2d 411 (1985). Under the undisputed facts in this case, without resolution of immaterial disputes, it is clear that a reasonable officer could have believed that shooting Isquierdo was a lawful act.

Plaintiff's arguments in resisting summary judgment run afoul of the Supreme Court's directives that (1) a particular use of force by an officer is not to be judged by 20/20 hindsight and (2) the reasonableness of the force must allow for the fact that an officer is often required to make split-second judgments in a tense and rapidly evolving situation. *Graham v. Connor,* 490 U.S. at 396–7, 109 S.Ct. at 1871–2. From this perspective, and setting aside all disputed facts, what were the circumstances facing Officers Cox and Frederick on the night of November 26–27, 1993?

Around midnight, the two officers heard a number of shots being fired in an area several blocks away from their location, and they hurried in their vehicles toward the general direction of the shots. On the way, they received a dispatch giving them further information about the location of the shots. They arrived in the area of 401 Oakwood Avenue in Sanford. Frederick talked with a neighbor concerning the house where the shots appeared to have come from. The officers took up a position in a ditch near the house. They then heard another series of shots,

these shots coming from *inside* the house, whereas earlier reports had concerned outside shots. Officers Cox and Frederick went to the northeast side of the house and took cover behind a tree near a window. The officers approached the window and found a small pie-shaped opening at the bottom of the curtains through which they could peek into the bedroom. Each looked inside for a matter of seconds on one or more occasions. Each saw a man holding a gun, and also saw a woman and two young children on a bed a few feet away from the gunman. The children were crying. Each saw, during a brief look, the man on the bed with the children, with the gun either in his hand or placed on the bed. Frederick radioed the dispatcher to send all available cars to help with a "possible hostage situation." The officers were at the window, discussing strategies to resolve the situation. Suddenly, three more shots rang out. From the proximity and sound of the shots, the officers concluded, reasonably and correctly, that the shots were fired in the bedroom by the man they had seen holding a gun. The officers checked to make sure neither had been hit by a stray bullet. Frederick, the superior officer, determined that the man inside was posing an imminent and deadly threat to the safety of those in the bedroom, and told Cox to "take him out" if he had a chance. Both officers (or only Cox if any dispute caused by Hall's testimony is considered) rose, took aim at the center of the body mass of the gunman for a matter of seconds, and fired. Isquierdo fell with half his body in the bedroom, half in the hallway, having been shot twice in the back.

Cox and Frederick did not know that the gunman they saw was Jose Vasquez Isquierdo or that Isquierdo and Polito were living together. They did not know that the children were Isquierdo's. They did not know that Polito, according to her deposition testimony, was not afraid for her safety or the safety of her children. They did not know that Isquierdo was drunk.

A reasonable officer possessing the information held by Cox and Frederick could have believed that it was lawful to shoot Isquierdo. It was reasonable to conclude that a life or death situation was immediately at hand, and

that the use of deadly force upon the gunman in the bedroom was necessary to prevent the imminent loss of life. The officers were presented with dangerous and bizarre circumstances. Firing a gun *inside* a house is, standing alone, highly dangerous and unstable behavior. When it is done in a small bedroom with another adult and two crying children present, the danger reasonably perceived by the officers rises to a level of imminent and lethal danger.

Plaintiff's evidence tends to show that actually Isquierdo was just incredibly drunk, loved his children, would not have fired on them, and was leaving the room at the instant he was shot. Plaintiff thus seeks to hold the officers liable for, under Plaintiff's evidence, misperceiving the circumstances and acting too hastily. Misperception, however, would not cause the officers to lose their immunity from liability, so long as their perceptions of the danger presented were reasonably formed by reliance upon appearances. *Ford v. Childers,* 855 F.2d 1271, 1276 (7th Cir.1988) The officers cannot have known what was in Isquierdo's mind, and the law does not require them to make such speculations. The futility of requiring the officers to stay their hand in hopes that Isquierdo would not carry through with his objectively threatening behavior is well illustrated in this case by the deposition testimony of Linda Polito. Polito was asked, "If you were outside and saw a man standing at this 'x' [on the diagram] with a woman and two children in the bed when this man shot a gun approximately three times, and you were outside the window and you didn't know any of these people, would you have been able to say with certainty that that man would not have harmed those children?" Polito answered, "I couldn't say either way. Like I say, I'm not a mind reader. I couldn't say either way what that person [the gunman] would do." (Polito dep. at 90–91.)

The crux of Isquierdo's argument seems to be that the officers' actions cannot be seen as objectively reasonable since the shots the officers fired hit Isquierdo in the back. It is indisputable that the shots fired by Cox or Frederick entered the Plaintiff from the back. Isquierdo's contention, therefore, is that regardless of what danger the officers may have perceived when Isquierdo fired three shots in the bedroom, when the officers (or Cox) rose to take aim and shoot the gunman, they (or Cox) should have seen that Isquierdo was turning away or had turned away from the bed and was heading toward the doorway. The officers should have known that any imminent and lethal danger had abated and they no longer had reason to use deadly force.

This argument must fail. The argument is based on precisely the kind of parsing of split-second events that the Supreme Court ruled out in *Graham v. Connor.* The court has already found that Frederick's decision to use deadly force on the gunman in the bedroom was objectively reasonable after the gunman fired three shots in the occupied room. By the time the officers (or Cox) rose and sighted down their weapons (or weapon), focused on the central body mass of the gunman, and pulled the trigger, the gunman had turned or was in the process of turning his back so that he faced away from the officers and toward the door. The lawfulness of the officers actions cannot be judged by such a "freeze-frame" review of the incident. This was an extremely tense, rapidly moving incident, with lives apparently on the line under the reasonable perceptions of the officers. *Graham v. Connor* instructs that "the calculus of reasonableness" must include allowances for rapidly moving events. Plaintiff's argument simply exceeds those allowances. It asks that the actions of the officers be judged with 20/20 hindsight, with emphasis on the very last position of the gunman at the instant the officers (or Cox) fired. Such an argument, if accepted, would virtually incapacitate law enforcement officers, assuming they wish to avoid civil liability, from taking major action in emergency situations. This is precisely the outcome prohibited by such cases as *Graham v. Connor* and *Slattery v. Rizzo.*

Moreover, Plaintiff's argument attaches too much significance to the fact that, at the moment the officers (or Cox) shot, the gunman had turned his back away from the bed where the woman and children were. Polito stated on deposition that she believed that Isquierdo was leaving the room to put up the gun, and the incident would soon be over.

Once again, however, the officers are not held by the law to be mind readers. Isquierdo had fired many shots that night, to the officers' knowledge, and had obviously reloaded his gun more than once. Objectively viewed, his action in turning away was as consistent with reloading his gun, or carrying on the siege in some other way, as with abandoning all dangerous behavior. He still had the gun in his hand. From the officers' viewpoint, the gunman could as easily have turned and shot the woman and children from a distance of ten feet as from a distance of five or six feet. In short, Plaintiff's theory that the officers (or Cox) should have perceived that he had ceased his threatening behavior is without foundation. Whatever direction the gunman faced at the instant the officers (or Cox) pulled the trigger, the officers' perception of him as a deadly and immediate threat to others was reasonable. Thus, the fact Isquierdo was shot in the back does not expose the officers, under these rapidly moving circumstances, to liability.

 From the discussion above, it is clear that Plaintiff's state law claims against the Defendants must also fail. Under North Carolina law, the negligence claims against law enforcement officers may stand only if there is evidence of malicious conduct by the officers. See *Smith v. State*, 289 N.C. 303, 331, 222 S.E.2d 412, 430 (1976). Clearly, there is no such evidence. Plaintiff's assault and battery claim fails since the court has found the use of deadly force by Defendants to be privileged under the circumstances of this case.

For reasons set forth above, the court concludes that Defendants Cox and Frederick are fully shielded from civil liability by their defense of qualified immunity. Under undisputed evidence in this case, the use of deadly force upon the Plaintiff, a gunman whom the officers reasonably perceived to pose an imminent threat of lethal danger to others, was reasonable and justified. Of course the human tragedy of the incident is difficult to accept. Plaintiff Isquierdo is permanently disabled by the bullets in his back. He was drunk at the time, so drunk that his blood alcohol level was found to be a staggeringly high .328. With alcohol undoubtedly a major cause, Isquierdo acted, for a significant period of time, in an incredibly dangerous manner. Law enforcement officers reasonably perceived him as a lethal danger to others, and they used deadly force in an attempt to stop him. Alcohol, and Isquierdo acting under its influence, led to this pointless injury to the Plaintiff. But Plaintiff has no legal basis for attempting to assign civil liability to Defendants Cox and Frederick. They acted within the bounds of reasonable conduct by law enforcement officers under the emergency circumstances that confronted them as a result of Isquierdo's bizarre actions.

### Conclusion

Accordingly, **IT IS ORDERED** that the summary judgment motion of Defendants Cox and Frederick be, and hereby is, **GRANTED.** A judgment dismissing this action will be entered contemporaneously herewith.[1]

**1.** The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).