**Bernard C. VUN CANNON, Individually and on behalf of all others similarly situated, Plaintiff,**

v.

**Allen F. BREED et al., Defendants.**

**No. C–70–2423 WHO.**

United States District Court,
N. D. California.

March 28, 1975.

1372

non"), an inmate in K–Wing at the Deuel Vocational Institute ("DVI"), was stabbed by a fellow prisoner. K–Wing is one of the maximum security portions of DVI, itself a maximum security institution within the California State prison system. The shocking, and today almost unbelievable, description of this medieval prison was provided by those incarcerated and employed there. K–Wing was, in June, 1970, and remains today, a human zoo—a dank, dark, dirty and noisy place where inmates are locked in their cells virtually around the clock. During the time period germane to the incident which prompted this litigation, each seven by nine foot cell was occupied by two men despite the fact that there was only one bed in each cell; one inmate had to sleep on a mattress on the floor.

DVI inmates were housed in K–Wing and particularly on K–1 (the ground floor level of K–Wing where Vun Cannon resided) because they were disciplinary problems. Punishment for violations of institution regulations was often administered to K–Wing residents in the form of a short sentence to one of the wing's "quiet cells". These were somewhat shorter than the regular K–Wing cells in order to accommodate a set of double doors, one of which was solid. When the solid door was closed, the occupant was thrust into near total darkness. On occasion, inmates were compelled to undergo this ordeal stripped of their clothing.

In order to cope in this dehumanizing environment, the inmates developed a social system based, in part, on racism and violence. Official Department of Corrections statistics reflect that during the period in question DVI was *the* most violent of all state institutions. Although confined to their cells, inmates banded into cliques, which invariably were formed along racial lines. Inmates spent many of their waking hours plotting, with other members of their particular cliques, their own self-aggrandizement and/or their self-preservation.

B. E. Bergesen, III, Armando M. Menocal, III, San Francisco, Cal., for plaintiff.

Evelle J. Younger, Atty. Gen., of Cal., Jack R. Winkler, Chief Asst. Atty. Gen., Crim. Div., Edward P. O'Brien, Asst. Atty. Gen., Gloria F. DeHart, Patrick G. Golden, Deputy Attys. Gen., San Francisco, Cal., for defendants.

ORRICK, District Judge.

On the morning of June 8, 1970, plaintiff, Bernard Vun Cannon ("Vun Can-

Occasionally, a member of one clique would engage in a shouting match with a member of a rival group. Due to the inmates' enforced idleness, exchanges of obscenities and slurs would often go on for extended periods of time. The participants in such exchanges created certain expectations in their peers; pursuant to the unwritten code of prisoner conduct, the two were obligated to engage in physical combat as soon as they were able to do so. In K–Wing this meant that if, by chance or otherwise, the two were ever chosen by the officer on duty to exercise together (only two or four inmates exercised at any one time), they had to fight. Fighting, in that environment, meant more than coming to blows since many inmates possessed crudely fashioned knives and daggers.

Vun Cannon was a member in good standing of a white supremacist clique. He claimed to be a member of the Nazi Party and responded to the nickname "German". In early June, 1970, he engaged in a series of verbal confrontations with a black inmate named Spencer. The insults and slurs were heard by many of their fellow inmates, and most of the K–Wing prisoner population expected that the two would make good on what in essence was their bargain to engage in mortal combat the next time they had access to one another. Within a few days the two were presented with just such an opportunity; they were released to exercise together. Instead of fighting, however, the two engaged in a brand of jailhouse detente.

Vun Cannon's peers became incensed over what they deemed to be an act of extreme cowardice. There was much talk among members of Vun Cannon's clique about the incident and about what to do with Vun Cannon now that he had failed them. The caged men communicated through several means: cellmates, of course, could discuss matters in hushed tones in near privacy; inmates out on the tier for their daily hour of "exercise" (walking back and forth down the narrow, dimly lit corridor), could stop and talk with other individuals still locked in their cells; they could shout between cells; or they could talk "over the vents" or through the plumbing. The latter two means of communication constituted an inmate network of information. The vents are ventilation grills behind each cell which lead to a large ventilation tunnel. The problem with this means of communication, like the problem with shouting, is that discussions could be overheard by guards and anyone else who happened to be within earshot.[1] Another problem with talking over the vents is that once more than one or two conversations were in progress simultaneously, it became difficult to keep track of what was being said.

As the monotonous hours and days wore on, the enmity against Vun Cannon from his former confidants grew. Finally, the clique decided, collectively, that Vun Cannon should be taught a lesson for his indiscretion. As with many other planned attacks, however, the aggressor was not a specified individual; it was to be the first of several candidates who was afforded the proper opportunity. Leo Giddings ("Giddings"), a former confederate of Vun Cannon's, was among the more vitriolic. It was Giddings who was presented with the first opportunity and it was he who in fact stabbed Vun Cannon several times [2] with a dental tool

---

1. In fact, the guards kept a stethoscope in the ventilation tunnel to facilitate more accurate eavesdropping than that permitted by the naked human ear.

2. The cell doors in K–Wing are secured by a double-lock system. A lock on each door can be opened only by a key possessed by the correctional officer on duty. But the cell door cannot be opened even after this lock has been disengaged until a master switch in the guard space known as the barbox is activated. After the barbox is switched on, only those cell doors previously unlocked by the officer on the tier can be opened. On the morning of June 8, 1970, Correctional Officer Richard Ezell unlocked Vun Cannon's and Giddings' cells to allow them and their cellmates to exercise; Vun Cannon, however, chose to remain in his cell and sleep. After

that had been converted into a sort of stiletto. Vun Cannon was severely injured, both physically and psychologically.

Vun Cannon brought this action against several DVI administrators and correctional officers alleging various civil rights violations, specifically that the defendants had prior knowledge that Giddings intended to attack him, and that they used this knowledge, individually and in a conspiracy, to "set up" the assault. As the case developed through discovery and pretrial motions, all but two defendants were dropped from the action. The two remaining defendants are Sergeant LaVern Nelson ("Nelson") and Correctional Officer Richard Ezell ("Ezell"); the former was the officer-in-charge of K–Wing at the time of the assault, and the latter was the individual who threw the switch that unlocked Vun Cannon's cell, thus affording Giddings access to his sleeping victim. The case was tried to the Court sitting without a jury on February 3, 4, 5, 6 and 7, 1975. Final argument was heard on February 14, 1975. Because plaintiff has failed to prove a crucial element of his case, I find for the defendants.

The Civil Rights Act forbids persons acting under color of state title from violating federally-secured rights, and Vun Cannon alleges that he was denied equal protection of the laws, that the putative setup violated his right to be free from cruel and unusual punishment, and that defendants acted as they did toward him in retaliation for his exercise of constitutionally protected speech. The defendants are also alleged to have conspired to deprive him of his aforementioned constitutional rights. 42 U.S.C. §§ 1983, 1985.

■■ In order to make a *prima facie* case under 42 U.S.C. § 1983, an inmate must prove not only that his jailer's actions or omissions were more than neg-

ligent, but that the jailer acted with "a bad faith oppressive motive" in an attempt to deprive him of his constitutional rights. Williams v. Field, 416 F. 2d 483 (9th Cir. 1969), cert. denied 397 U.S. 1016, 90 S.Ct. 1252, 25 L.Ed.2d 431 Mere negligent failure of a jailer to protect a prisoner does not constitute a violation of the federal civil rights act.

■ The parties agree that in order to prove a *prima facie* case, plaintiff must establish that defendants knew, *before* Ezell engaged in the course of conduct that resulted in Giddings' access to the cell, that Giddings intended an assault. The parties are not in agreement over the requisite degree of knowledge. That problem aside, if Ezell, with sufficient knowledge, failed to exercise due care in preventing an attack, then he would possess the bad faith oppressive motive required by Williams v. Field, *supra*.[3] For then, Ezell's failure to protect could no longer be denominated as an "isolated incident" (Williams v. Field, *supra*, 416 F.2d at 485), but rather would be conduct the "natural consequences" of which would be a violation of Vun Cannon's constitutionally protected rights. Monroe v. Pape, 365 U.S. 167, 187, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). Moreover, the conduct alleged in this case is more egregious than that alleged in Williams v. Field, *supra*, since Ezell is charged with setting the sequence of events into motion. This affirmative commission of an act contrasts with the omission alleged in *Williams*.

■ Defining prior knowledge in a case of this nature is a difficult undertaking; no court has dealt specifically with such a question. Certainly a guard does not have to believe to a moral certainty that one inmate intends to attack another at a given place at a time certain before that officer is obligated to take steps to prevent such an assault. But, on the other hand, he must have

the three men left their cells and shut the doors, the barbox was switched to the lock position, thus sealing them out on the tier and Vun Cannon in his cell. When the three were ordered back to their cells later and the barbox was switched to open, Giddings

entered Vun Cannon's cell rather than his own.

3. Nelson's liability, if any, would stem from his having conspired with Ezell, since Nelson undisputedly was not present on the tier at the time of Ezell's challenged actions.

more than a mere suspicion that an attack will occur. This knowledge problem is rendered even more complex in the context of a place like K–Wing where shouted threats are common and rumors and spoken fantasies are part of every inmate's daily existence.

Defining degrees of knowledge is not really an issue in this case, however, because Vun Cannon has failed to prove that either Ezell or Nelson heard, or should have heard, about his falling into disfavor with his former confederates or about Giddings' intentions prior to the assault. Much testimony was devoted to this critical issue. Such testimony was diverse, with the accounts of some witnesses directly at odds with those of others. And while the relevant events took place four and one half years before trial, and even recognizing that the human memory is fallible, I would be less than candid if I did not comment that some of the testimony adduced at trial—from witnesses for both sides—was highly suspect. Nevertheless, I find that plaintiff did not prove that defendants had any prior knowledge of the falling out or of the intended attack.

One final issue should be discussed—the admissibility of the testimony of plaintiff's expert witnesses. Dr. Jerome Miller, an eminent sociologist and penologist, testified, over objection, on behalf of the plaintiff. Dr. John Irwin, Associate Professor of Sociology at San Francisco State University, was also called by plaintiff. At the close of his testimony, defendants moved to strike it, and such motion was taken under submission. Plaintiff presented a written offer of the expected testimony of a third expert, Dr. Philip Zimbardo, a professor of psychology at Stanford University, after the Court ruled his proffered testimony inadmissible. Defendants then called Dr. Edmund Mackenberg, a staff psychologist at DVI, and Dr. Joyce Sutton, a staff psychiatrist at San Quentin.

The four experts who did testify and the one who would have, if called, discussed the psychological and sociological effects on prisoners and on guards of the maximum security experience. They defined the term "set up", explained why such behavior was manifested, if ever, and attempted to educate the Court in general on what it was like to be a prisoner or a guard in the confines of a place like K–Wing. The testimony was highly informative, and even more highly depressing. However, whether it is admissible for all the reasons it was proffered is another question I need not reach in resolving this case. I note that plaintiff's two testifying experts opined that while some correctional officers could react in a hostile and animalistic fashion to the inhuman conditions in an environment like K–Wing, predicting how a particular officer would react is impossible.

Pursuant to Rule 52 of the Federal Rules of Civil Procedure, this Opinion constitutes the Court's findings of fact and conclusions of law, and pursuant thereto:

Defendants are ordered to prepare, serve, and file on or before April 9, 1975, a judgment in accordance with the foregoing Opinion in form approved by the plaintiff.