Kathy Roberts **POPHAM**, etc., **Plaintiff**,

v.

**CITY OF TALLADEGA, et al,**
**Defendants.**

**Civ. A. No. CV88–PT–0616–E.**

United States District Court,
N.D. Alabama, E.D.

June 1, 1989.

Albert C. Bowen, Beddow Fullan & Vowell, Robert L. Wiggins, Jr., Gordon Silberman Wiggins & Childs, Birmingham, Ala., for plaintiff.

Robert E. Parsons, Parsons Lee and Juliano, Birmingham, Ala., for defendants.

Earl Martin Bloom, Jr., William A. Davis, III, Starnes & Atchison, Birmingham, Ala., for City of Talladega.

## MEMORANDUM OPINION

PROPST, District Judge.

This cause comes to be heard on Motions for Summary Judgment filed by the individual defendants[1] on March 3, 1989, and by the City of Talladega on March 14, 1989. This action arises out of the suicide death of plaintiff's decedent, Robert Popham, while incarcerated in the Talladega City Jail on December 24, 1987. Plaintiff alleges that defendants, in each's official and individual capacities, denied her decedent substantive due process and other civil rights as guaranteed and protected by the Fourteenth Amendment and 42 U.S.C. Section 1983 *et seq.* Plaintiff also states a claim for wrongful death under Ala.Code § 6–5–410.

Around 9:00 p.m. on the evening of December 24, 1987, plaintiff, Kathy Roberts Popham, telephoned the Talladega Police Department to report a disturbance involving her husband, Ronald (Ronnie) Popham, at the home of James and Christine Wilson, where the Pophams had gone to celebrate their (the Popham's) wedding. Officers Jones and Williams responded to the call, and after arriving at the scene, Officer Watson was called for backup. The officers arrested Ronnie Popham for public intoxication,[2] which he violently resisted. In an effort to handcuff Popham, the officers wrestled with him, and Officer Jones struck him on the chin and in the stomach area with a police baton. When they arrived at the Talladega Police Department, the officers had to forcefully place Ronnie Popham directly into the holding cell, removing his belt, shoes, and the contents of his pockets. Officer Jones testified in his deposition that before he left Mr. Popham in the holding cell, he (Popham) had calmed down, and Officer Jones talked with him briefly telling him that "it's all over with, everything is okay." When he left, Jones testified that Popham began to cry or whimper.

The Talladega jail is equipped with closed circuit television monitors, and David Brooks, the dispatcher on duty at the time Popham was placed in the holding cell, was instructed by Sergeant Watson to lock the camera monitor on the holding cell. Before leaving the police station, Sergeant Watson checked on Mr. Popham between 10:30 and 11:00 that evening. The third shift[3] dispatcher, David Brooks, who was responsible for monitoring the radios and the closed circuit television monitors, stated that between 10:00 p.m. and 11:00 p.m., he observed Ronnie Popham walking around in the holding cell, but did not notice anything unusual. These were the last occasions Popham was observed before his body was discovered at 5:15 the next morning.

In his statement to the ABI investigator, David Brooks acknowledged that "there are several spots in the dayroom [holding cell] where a person can stand or lay out of the view of the camera." He further stat-

---

1. The individual defendants include: Talladega Police Chief, Mike Hamlin, and Police Officers Randy Jones and Mark Williams; Talladega Mayor, George Montgomery; and the members of Talladega City Council, Robert Duncan, Edith Sims, Charles Miller, James Braswell, and Ken Payne.

2. Plaintiff testified in her deposition that Ronnie Popham had been drinking that day and evening, but was unsure as to the amount.

3. Third shift was from 10:00 p.m. December 24, 1987, until 6:00 a.m. December 25, 1987.

ed that it was "not unusual for an inmate to lie in one of these spots without trying intentionally to be out of view." Brooks stated that he knew Popham had been arrested for public intoxication, and that he therefore assumed Popham was somewhere in the cell out of view "sleeping it off."

■■■ Also incarcerated that same evening was Randy Langley, who had known Ronnie Popham all of his life and had been incarcerated at the same time as Popham on numerous occasions in the past. Langley was confined two cells down from Popham, and observed the officers struggling to get him into the holding cell. Langley stated in his sworn statement[4] that Popham appeared and sounded drunk, and that he cursed, kicked, and spat at the officers, and off and on, after he had been left in the cell, screamed and called for them to come back and "take him on", so to speak, after the handcuffs had been removed. Langley also stated that Popham had been hollering so much that he began to cough and gag, but eventually quieted down, and began talking to Langley—"drunk talk," to which Langley did not "pay that much attention ... [because] a drunk will tell you anything." Some of what Popham told Langley concerned the events of the evening that purportedly led to Popham's arrest that night. Langley further testified as follows:

> About 11:00 when he got real quiet and he calmed down, like he had done prior to that, and he just calmed down. And in normal voice, I mean, he just told me, he said, "Make sure my wife and my kids get what they deserve out of this because I'm going to kill myself." And I told him, I said, "No, Pop, you don't want to do nothing like that." And he said, "Well, I am." That was his last

words. I was sleepy. It was 11:00. I mean, it didn't strike me that he would do it, you know. But it wasn't five minutes after he told me that I heard a gag, like a choke, but what I—I mean, you know, what I actually thought was that he was gagging, you know, spitting like he had been doing ever since 7:00, like he was spitting in the floor. But he had got quiet. And I heard that gag and I never heard no more from him, so I went on to sleep. That was about 11:00.

Langley testified that, while in retrospect, that last gagging sound he heard sounded different from those had heard Popham make earlier, he "didn't pay no attention" then, and "didn't think nothing about it because I didn't think he would do it. I mean, I had been around him all my life." (Langley Sworn Statement at pp. 31–32.) In other words, Langley did not take Popham's suicide threat seriously.

At 5:15 a.m. on December 25, 1987, jailor Thurman Smith discovered Ronnie Popham hanging from the jail cell bars by his blue jeans. He had hung himself behind the shower in the cell, an area which was not within the viewing range of the closed circuit camera.

## I. *Was There a Constitutional Deprivation?*

■■■ The evidence is undisputed in this case that Ronnie Popham had been incarcerated in the Talladega City Jail on numerous occasions since the mid–1970's, and on none of those occasions had he ever threatened or attempted to commit suicide. Nor is there any evidence that on the night in question Ronnie Popham threatened or in any way communicated *to any of the defendants* his desire, plan, or intent to commit suicide that night or sometime during his incarceration. While there is undis-

---

**4.** The plaintiff has filed a Motion to Strike the sworn statement by Randy Langley, contending that the statement was taken without notice to the plaintiff or her attorneys. However, the plaintiff has also submitted in opposition to defendants' motions a statement by Randy Langley given during an ABI investigation of Popham's suicide. This latter statement contains substantially the same information as that summarized herein from Langley's sworn statement. To the extent the statement submitted by

plaintiff duplicates the sworn statement submitted by defendants, plaintiff has waived her motion to strike. The court need not address whether it is necessary for such a statement to be taken in the presence of plaintiff's representative. *Ex parte* affidavits are often submitted. The form of the statement should not be that significant. Furthermore, Langley's statement is in no way critical to the court's decision. It could be ignored and the decision would be the same. Its absence would create no issue of fact.

puted evidence that indeed Popham had attempted to commit suicide approximately one week prior to his death by taking an overdose of Thorazine, there is no evidence whatsoever that any of the defendants had actual or constructive knowledge or notice of that prior suicide attempt by Popham. Nevertheless, when Popham was brought in on the night in question, after being placed in the holding cell, his belt and shoes were removed, and the dispatcher on duty was instructed to monitor the holding cell by way of the closed circuit television cameras with which the jail was equipped.

As recently noted by the Eleventh Circuit in *Edwards v. Gilbert*, 867 F.2d 1271, 1274–75 (11th Cir.1989),[5]

"[i]n a prisoner suicide case, to prevail under section 1983 for violation of substantive rights, under either the eighth or fourteenth amendment, the plaintiff must show that the jail official displayed "deliberate indifference" to the prisoner's taking of his own life. *See Whitley v. Albers*, 475 U.S. [312] at 327, 106 S.Ct. [1078] at 1088 [89 L.Ed.2d 251 (1986)] *State Bank of St. Charles v. Camic*, 712 F.2d 1140, 1146 (7th Cir.1983).

The court further noted the following:

In the absence of a previous threat of or an earlier attempt at suicide, we know of no federal court in the nation or any other court within this circuit that has concluded that official conduct in failing to prevent a suicide constitutes deliberate indifference. *See e.g., Cabrales v. County of Los Angeles*, 864 F.2d 1454 (9th Cir.1988) (denying defendants' motion for JNOV where jailers had rescued decedent from previous suicide attempt); *Partridge v. Two Unknown Police Officers*, 751 F.2d 1448 (5th Cir.1985), *withdrawn*, 755 F.2d 1126 (5th Cir.1985), *Substituted opinion*, 791 F.2d 1182 (5th Cir.1986) (plaintiff stated a valid claim where it was known that detainee-decedent had attempted suicide in previous confinement); *Guglielmoni v. Alexander*, 583 F.Supp. 821 (D.Conn.1984) (defendants' motion for summary judgment

denied where inmate-decedent had "faked" suicide by hanging then actually hung himself a month later); *Matje v. Leis*, 571 F.Supp. 918 (S.D.Ohio 1983) (defendants' motion for summary judgment denied where inmate-decedent told counsel who told jail officials that inmate would attempt suicide if sent to jail by smuggling in drugs behind her diaphragm and body cavity search was not performed at jail); *Francis v. Pike County*, 708 F.Supp. 170 (S.D.Ohio 1988) (summary judgment in favor of defendants appropriate, where police officer failed to remove the detainee's belt and detainee used belt to hang himself, because there was no evidence that officer or any other employee of sheriff's department knew or should have known that detainee was suicidal); *Hutchinson v. Miller*, Case No. 86–6005–CA–T (Fla. 18th Cir.Ct. Sept. 15, 1988) (jailers entitled to summary judgment because of absence of evidence that jailers had knowledge of suicidal tendencies, where juvenile inmate asked to remain in doors while his cell mates went out for exercise and hung himself while left alone for an hour).

867 F.2d at 1275.

Here, there is no evidence of any knowledge on the part of the officials in question of a previous threat or attempt at suicide by the decedent. Without that critical element, the court concludes that plaintiff has failed to adduce *substantial*, and not merely colorable, evidence that would support a finding that the official conduct in failing to prevent Ronnie Popham's suicide constitutes deliberate indifference. Plaintiff's expert opinion cannot be substituted for the law of *Edwards*. Several of plaintiff's arguments are specifically rejected in *Edwards*:

More important, the law was unclear on whether the presence of some of the expert's "factors" which might indicate that a prisoner is in a category of persons more likely to commit suicide than

---

**5.** A factually similar case which reversed the *denial* of a motion for summary judgment. The decedent there was a juvenile rather than a repeat offender adult. There Florida law re-

quired extra precautions with regard to juveniles. The plaintiff there also relied upon expert opinion.

the general population was sufficient to create a duty to take special suicide precautions. *See Roberts v. City of Troy,* 773 F.2d 720, 723 725 (6th Cir.1985) (plaintiff's argument that proper screening at jail would have shown that decedent fit profile of high suicide risk in lockup insufficient to establish deliberate indifference under any definition); *Estate of Cartwright v. City of Concord,* 618 F.Supp. 722, 728 (N.D.Cal.1985), *aff'd,* 856 F.2d 1437 (9th Cir.1988) (jailers had no reason to believe decedent was suicidal despite fact that he was under influence of alcohol or drugs and that he had made a remark, ostensibly in jest, to jailers about killing himself). The deliberate indifference standard is met only if there were a "strong likelihood, rather than a mere possibility," that self-infliction of harm would result. *State Bank of St. Charles v. Camic,* 712 F.2d at 1146; *Danese v. Asman,* 670 F.Supp. 709, 718 (E.D.Mich.1987); *Matje v. Leis,* 571 F.Supp. at 930; *Guglielmoni v. Alexander,* 583 F.Supp. at 826. *See also Thompson v. County of Rock,* 648 F.Supp. 861, 871 (W.D.Wis 1986) (same standard applied in search and seizure case); *Vun Cannon v. Breed,* 391 F.Supp. 1371 (N.D.Cal.1975) (similar standard applied in inmate violence case). In the circumstances, a reasonable jailer could have believed that it was constitutional to behave as Blackshear and Gilbert behaved; put differently, it was by no means settled that their acts constituted deliberate indifference to a potential suicide where no suicide had been attempted or threatened.

867 F.2d at 1276. The court ultimately concludes that, even if there has been a constitutional deprivation, the defendants in their individual capacities are entitled to qualified immunity and that there is no official policy, custom, lack of training, etc. to support an official capacity claim or a claim against the City. Therefore, defendants are entitled to summary judgment on the plaintiff's constitutional claims on this basis alone. The court will, however, address other issues. The key to all the issues is "deliberate indifference" and all issues intertwine in this respect.

## II. *Qualified Immunity*

■ In support of their motions for summary judgment, the individual defendants also contend that they are entitled to qualified immunity in their individual capacities with regard to plaintiff's constitutional claims.

In *Edwards v. Gilbert, supra.* 867 F.2d at 1273, the court detailed the standard of conduct entitling government officials to qualified immunity:

In *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), the Supreme Court held that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* at 818, 102 S.Ct. at 2738. In so holding, the Court established an objective standard to make summary judgment an appropriate device to "avoid excessive disruption of government and permit the resolution of many insubstantial claims...." *Id.; Barts v. Joyner,* 865 F.2d 1187, 1189 (11th Cir.1989).

Once a defendant advances a defense of qualified immunity, he is entitled to summary judgment unless "the legal norms allegedly violated by the defendant were clearly established at the time of the challenged actions...." *Mitchell v. Forsyth,* 472 U.S. 511, 528, 105 S.Ct. 2806, 2816, 86 L.Ed.2d 411 (1985). "The words 'clearly established ... constitutional rights' may not be used to read the defense of immunity out of federal tort law by the facile expedient of stating constitutional rights in the most general possible terms...." *Azeez v. Fairman,* 795 F.2d 1296, 1301 (7th Cir.1986). The Supreme Court has stressed that "the right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 635,

107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987).

An official will be immune if "the law with respect to [his] actions was unclear at the time the cause of action arose" or if " 'a reasonable officer *could have believed* ... [his actions] to be lawful, in light of clearly established law and the information ... [the officer] possessed.' " *Clark v. Evans,* 840 F.2d 876, 879, 880 (11th Cir.1988) (quoting *Anderson v. Creighton,* 107 S.Ct. at 3040). For purposes of qualified immunity, an abstract mandate to act "with care" or "reasonably" is too vague; "generalities are just not helpful." *Muhammad v. Wainwright,* 839 F.2d 1422, 1424 (11th Cir.1987); *see Clark v. Evans,* 840 F.2d at 881, 882 (proper inquiry is "fact-specific"; officer who shot and killed fleeing prisoner immune because "[n]o case ha[d] expressly held that an officer has to first shoot to maim before shooting to kill"). In sum, "the qualified immunity defense ... provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986).

When a jail official in a jail suicide case raises the defense of qualified immunity as to claims under § 1983,

> the plaintiff must persuade the court that the law was clearly established that the defendant's conduct in the circumstances amounted to "deliberate indifference." See Mitchell v. Forsyth, 472 U.S. at 526–28, 105 S.Ct. at 2815–16; Clark v. Evans, 840 F.2d at 881–82, 884–86.

(Emphasis added). 867 F.2d at 1275.

As previously noted, the court in *Edwards v. Gilbert* acknowledged that it could find no federal court decision, nor any other court decision within this circuit, which had held, in the absence of a previous threat of, or attempt at, suicide, that the failure to prevent a suicide by a prisoner constitutes deliberate indifference. The court in *Ed-*

*wards* went on to examine the evidence in that case, surrounding the suicide of the plaintiff's decedent, under the above articulated standards: [6]

> In this case, before Molbert's death there was no mention by Molbert or anyone else of suicidal tendencies. Also, there was no evidence of unusual behavior. *Plaintiff relies only on the affidavit of an expert on jail suicides that lists generalized "predisposing factors" which the expert contends should have alerted defendants that Molbert was at risk. The expert is the author of an article on jail suicides which plaintiff contends defendants read or had a duty to read.*
>
> *Plaintiff presented no evidence that either defendant saw the article or was aware of its existence; the testimony was to the contrary. Plaintiff does not show why defendants had a duty to read the article.* That article, or a similar article, was not, Gilbert testified, mentioned in any of the regular training programs for sheriffs that he was required to attend. *The law does not require jail officials to keep up with the latest literature in the social sciences.* The article or opinions of plaintiff's expert cannot be considered part of the information available to the defendants when they acted as they did.
>
> *More important, the law was unclear on whether the presence of some of the expert's "factors" which might indicate that a prisoner is in a category of persons more likely to commit suicide than the general population was sufficient to create a duty to take special suicide precautions. See Roberts v. City of Troy,* 773 F.2d 720, 723, 725 (6th Cir.1985) (plaintiff's argument that proper screening at jail would have shown that decedent fit profile of high suicide risk in lockup insufficient to establish deliberate indifference under any definition); *Estate of Cartwright v. City of Concord,* 618 F.Supp. 722, 728 (N.D.Cal. 1985), *aff'd,* 856 F.2d 1437 (9th Cir.1988)

**6.** Because the plaintiff's factual arguments in this case closely mirror many of those made by the plaintiff in *Edwards v. Gilbert,* and the court's rulings thereon are by and large disposi-

tive in this case, the court's decision in *Edwards* is quoted at length herein and has significance with regard to all issues.

(jailers had no reason to believe decedent was suicidal despite fact that he was under influence of alcohol or drugs and that he had made a remark, ostensibly in jest, to jailers about killing himself).

The deliberate indifference standard is met only if there were a "strong likelihood, rather than a mere possibility," that self-infliction of harm would result. *State Bank of St. Charles v. Camic*, 712 F.2d at 1146; *Danese v. Asman*, 670 F.Supp. 709, 718 (E.D.Mich.1987); *Matje v. Leis*, 571 F.Supp. at 930; *Guglielmoni v. Alexander*, 583 F.Supp. at 826. *See also Thompson v. County of Rock*, 648 F.Supp. 861, 871 (W.D.Wis.1986) (same standard applied in search and seizure case); *Vun Cannon v. Breed*, 391 F.Supp. 1371 (N.D.Cal.1975) (similar standard applied in inmate violence case). In the circumstances, a reasonable jailer could have believed that it was constitutional to behave as Blackshear and Gilbert behaved; *put differently, it was by no means settled that their acts constituted deliberate indifference to a potential suicide where no suicide had been attempted or threatened.*

Plaintiff attempts to broaden defendants' constitutional duties by contending that defendants violated state laws and regulations on housing of juveniles in adult jails, which plaintiff argues give rise to a right of juvenile inmates to certain housing conditions. *In Davis v. Scherer, 468 U.S. 183, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984), the Supreme Court rejected this argument when it held that officials sued for constitutional violations lose no immunity simply because their conduct violates some state statute or regulation. The Court rejected the motion, implicit in plaintiff's brief, that official conduct that contravenes a state statute or regulation is not "objectively reasonable" because officials are ordinarily expected to conform to these legal norms. Id. at 193, 104 S.Ct. at 3018; see Clark v. Evans, 840 F.2d at 883* (although defendant jailer had notice that prison security measures were inadequate under state law, *defendant was immune because court found "nothing sufficient to place defendant ... on no-*

*tice that at the time of [plaintiff's] death the status of the [security measures] would violate [plaintiff's] constitutional rights.'')*

In jail suicide cases, courts have recognized that regulations cannot "supply certainty to an uncertain rule of constitutional law." *Gagne v. City of Galveston*, 805 F.2d 558, 560 & n. 2 (5th Cir. 1986). In *Gagne*, the court held that a police officer was immune even though he violated a departmental rule by failing to remove the belt from a detainee who then used the belt to hang himself. *Id.* at 558. *In Roberts v. City of Troy, 773 F.2d at 722, that violation of state monitoring regulations may have been a contributing cause of death in a suicide case was insufficient to establish deliberate indifference. The Seventh Circuit observed that officers in charge of an intoxicated and violent detainee who committed suicide could not. be characterized as deliberately indifferent "[e]ven if the defendants disregarded one or more of their established procedures, such as checking the cells every hour or effectively monitoring...." because the officers had no knowledge that the detainee was a suicide risk.* State Bank of St. Charles v. Camic, 712 F.2d at 1146.

*Finally, plaintiff tries to substantiate deliberate indifferences by arguing that Gilbert failed to staff the jail adequately. See generally Anderson v. City of Atlanta, 778 F.2d 678 (11th Cir.1985).* The evidence to support this position—that the jail had fewer officers than were needed, that Gilbert knew it was understaffed and decided not to increase the staff, and that Gilbert knew or should have known that the consequence of adequate staffing would be an inmate's suicide—is colorable at best. *See id.* at 686. Far more important, the law was by no means settled that the undisputed level of staffing at this jail, or in substantially similar circumstances, was understaffing or that this understaffing would amount to deliberate indifference. 867 F.2d 1275–77. (Emphasis added).

As noted, the plaintiff's factual arguments in this case closely mirror many of

those made by the plaintiff in *Edwards v. Gilbert, supra* and/or discussed by the court therein. First, plaintiff argues that the defendants failed to adequately staff the jail. Specifically, she contends that in violation of Ala.Code § 14–6–105, defendants failed or refused to station a guard on the night shift on December 24, 1987.[7] Section 14–6–105 relied on by plaintiff provides as follows:

"Prisoners shall not be confined in any jail or prison in this state when such jail or prison is not provided with a deputy, watchman, *or attendant, whose duty it shall be to watch the jail or prison at night for the prevention of escapes and fire and to aid in case of sickness among the prisoners,* and who shall have access to the jail or prison and to the prisoners...."

(Emphasis added).

Defendants counter this argument by pointing out that, on the night Ronnie Popham committed suicide, the jail was being monitored by radio dispatcher, David Brooks, by means of closed circuit television cameras,[8] and, therefore, § 14–6–105 was complied with.

Plaintiff also contends that defendants failed to follow their own departmental procedure which directs that intoxicated inmates "should be placed in a cell with other inmates so that they can be observed." Plaintiff further argues that defendants did not follow the minimum standards, promulgated by the Alabama Sheriff's Association for incarcerating persons in the county jails of this State, particularly the "requirement" that inmates be observed and/or made contact with five times per 8–hour period. These standards were promulgated to apply to *county* jails. The specific provision these defendants are alleged to have violated provide in pertinent part as follows:

18–004

Written policy and procedure require that each inmate *classified as high or medium security be checked* on at least 5 times during an 8–hour period. By means of personal observation, *closed circuit T.V.* or intercom.

*Each inmate classified as lower minimum security should be personally observed by a correctional officer at least twice every 8–hour period....*

(Emphasis added). Alabama County Jail Standards, Alabama Sheriffs Association, p. 41.

Although there is no evidence as to what if any security classification was given to Ronnie Popham, it would be more than reasonable to infer that, given the frequency of his "visits" to the Talladega jail, he would have been considered "lower minimum security," and therefore the interval of his observation (twice in six hours) would have been in keeping with the above standards. However, even assuming arguendo that defendants were in violation of § 14–6–105, their own departmental policy, and were subject to, and in violation of, the above-quoted provision of the Alabama County Jail Standards, "officials sued for constitutional violations lose no immunity simply because their conduct violates some state statute or regulation." *Edwards v. Gilbert, supra,* 867 F.2d at 1276, discussing *Davis v. Scherer,* 468 U.S. 183, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984). As for the alleged failure to properly monitor, particularly on point are two other decisions cited and discussed with approval by the court in *Edwards v. Gilbert:*

In *Roberts v. City of Troy,* 773 F.2d at 722, that violation of state monitoring regulations may have been a contributing cause of death in a suicide case was insufficient to establish deliberate indifference. *The Seventh Circuit observed that officers in charge of an intoxicated and violent detainee who committed su-*

---

**7.** Plaintiff states that defendants refused to fill a jail guard vacancy created by the discharge of a jail guard in October, 1987. Plaintiff contends that there was nevertheless sufficient police and jail personnel to station a guard in the jail on the night in question, but the defendants "elected not to do so."

**8.** Defendants maintain that the "watch" requirement of § 14–6–105 does not by its terms disallow the use of close circuit monitors for that purpose.

*icide could not be characterized as deliberately indifferent "[e]ven if the defendants disregarded one or more of their established procedures, such as checking the cells every hour or effectively monitoring....," because the officers had no knowledge that the detainee was a suicide risk. State Bank of St. Charles v. Camic, 712 F.2d at 1146.*

As for the alleged failure to adequately staff the jail, the evidence in this case is no greater than it was in *Edwards v. Gilbert, supra:*

(Emphasis added). 867 F.2d at 1277.

> [P]laintiff tries to substantiate deliberate indifference by arguing that Gilbert failed to staff the jail adequately. *See generally, Anderson v. City of Atlanta,* 778 F.2d 678 (11th Cir.1985). The evidence to support this position—that the jail had fewer officers than were needed, that Gilbert knew it was understaffed and decided not to increase the staff, and that Gilbert knew or should have known that the consequence of inadequate staffing would be an inmate's suicide—is colorable at best. *See id.* at 686. *Far more important, the law was by no means settled that the undisputed level of staffing at this jail, or in substantially similar circumstances, was understaffing or that this understaffing would amount to deliberate indifference.*

(Emphasis added).

Plaintiff attempts to circumvent the result mandated by *Edwards v. Gilbert* by arguing because another inmate, Ike Evans, had committed suicide in the Talladega Jail by hanging himself two weeks prior to Ronnie Popham's suicide, it is reasonable to infer that the "defendants knew the dangers of leaving inmates unobserved for an entire eight hour shift." However, plain-

tiff has adduced no evidence to show that any similarities between the two suicides existed. Indeed, according to the defendants' statement of facts, which plaintiff does not dispute, Ike Evans had been observed by jailor Thomas E. Jacks approximately five minutes before he was found hanging. In addition, Evans committed suicide during the first shift, 6:00 a.m. to 2:00 p.m. Nor is there any evidence that Ike Evans was intoxicated and/or in an emotional state. Furthermore, the issue is deliberate indifference, *vel non,* as to this decedent and the knowledge, if any, of his proclivity; not that of some other inmate. The argument is tantamount to saying that since it is known that some inmates in some jails have committed suicide, they must *all* be constantly observed.

Based on the authority of *Edwards v. Gilbert,* under the undisputed facts and circumstances of this case, the court concludes as a matter of law that these defendants' conduct did not constitute deliberate indifference to Ronnie Popham's safety from self harm,[9] and that "a reasonable officer in each of defendants' positions could have believed that he was acting consistently with the Constitution." *Edwards,* 867 F.2d at 1277. Accordingly, these defendants are entitled to qualified immunity in their individual capacities.[10]

### III. *Summary Judgment as to the City, and the Mayor, the Council Members, and the Police Chief, in their Official Capacities.*

By her complaint, the plaintiff alleges that the City, the Mayor, the Council members, and the police Chief "denied the decedent due process of law as guaranteed by the Fourteenth Amendment and 42 U.S.C. Section 1983 by failing and/or refusing and for maintaining [sic?] a policy or custom to provide him with reasonable pro-

---

**9.** The court notes with interest that on two occasions in her brief, plaintiff characterizes the defendants as *"recklessly* choosing not to provide any supervision or observation" of Popham during his first eight hours in jail, and states that they acted with *"a callous indifference or reckless disregard* for the safety of plaintiff's decedent." Even assuming that these standards are interchangeable, the court finds no evidence to support the claim(s). The case of *City of*

*Canton, Ohio v. Harris,* 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989) suggests that the terms are *not* interchangeable.

**10.** *See also Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) and *Clark v. Evans,* 840 F.2d 876, 880–81 (11th Cir.1988). The present opinion of plaintiff's expert is not a substitute for clearly established law.

tection from harm while incarcerated in the Talladega City Jail...." (Plaintiff's Second Amended Complaint).

In her brief in opposition, plaintiff argues that the City, acting through the Mayor and the City Council, delegated its policy-making authority to Police Chief Hamlin with respect to policies affecting the Talladega Police Department and City Jail. She therefore concludes that the City, the Mayor, and the Council are bound by Hamlin's actions and are liable for his decisions. Plaintiff further argues that these defendants acted with deliberate indifference in failing to establish procedures or policies for screening, classifying, identifying, and responding to suicidal individuals, and in failing to provide suicide prevention training to jail staff prior to Ronnie Popham's death. Plaintiff relies on the affidavit of an expert in the field of corrections, although not specific to jail or prison suicide, who states that the failure to provide procedures, policies, and training pertaining to prisoner suicide is not in keeping with the *Standards for Health Services in Jails*, National Commission of Correction Health Care, pp. 37–38 (January 1987). Plaintiff and plaintiff's expert further conclude that these defendants "were callously and deliberately indifferent to the strong likelihood that the plaintiff's decedent ... would or might injure [himself] or take [his] own life in the first eight hours of incarceration in an inebriated condition after an emotionally charged arrest followed by open crying and remorse in jail."

With respect to the liability of the individually named defendants sued in their "official capacities," the Supreme Court of the United States has held that a judgment against a public servant, "in his official capacity" imposes liability on the entity that he represents provided, of course, the public entity received notice and an opportunity to respond. *Brandon v. Holt*, 469 U.S. 464, 105 S.Ct. 873, 83 L.Ed.2d 878 (1985).

In *Rascon v. Hardiman*, 803 F.2d 269, 274 (7th Cir.1986) the court held the following:

To the extent that Mr. Hardiman [Executive Director, Cook County Department of Corrections] is sued in his official ca-

pacity, this action operates as a claim against the government entity itself. *Monell v. Department of Social Services*, 436 U.S. 658, 690 n. 55, 98 S.Ct. 2018, 2035 n. 55, 56 L.Ed.2d 611 (1978); *see Pembaur v. City of Cincinnati*, 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986); *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985); *Malak v. Associated Physicians, Inc.*, 784 F.2d 277, 283 (7th Cir. 1986); *Schultz v. Baumgart*, 738 F.2d 231, 238–39 (7th Cir.1984); *Wolf–Lillie*, 699 F.2d [864] at 870 [(7th Cir.1983)]. It is well-settled that a claim against a state or local agency or its officials may not be premised upon a *respondeat superior* theory. *See Monell*, 436 U.S. at 694, 98 S.Ct. at 2037; *Rizzo v. Goode*, 423 U.S. 362, 375, 96 S.Ct. 598, 606, 46 L.Ed.2d 561 (1976); *Malak*, 784 F.2d at 283; *Soderbeck v. Burnett County*, 752 F.2d 285, 292 (7th Cir.), *cert. denied*, 471 U.S. 1117, 105 S.Ct. 2360, 86 L.Ed.2d 261 (1985). "[T]ortious conduct, to be the basis for municipal liability under § 1983, must be pursuant to a municipality's 'official policy'...." *Pembaur*, 106 S.Ct. at 1298; *see Monell*, 436 U.S. at 691–95, 98 S.Ct. at 2036–38. Moreover, the Supreme Court has recently indicated that, "[p]roof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker." *Tuttle*, 105 S.Ct. at 2436; *see Malak*, 784 F.2d at 283. Thus, to state a claim against Director Hardiman, the plaintiff was required to show that the actions of the offending officers were taken pursuant to an official—albeit impermissible—policy.

Thus, relying on the above authorities, the individual defendants take the position that the lawsuit against them in their "official capacities" is actually a lawsuit against the city that they represent, City of Talladega. With respect to liability against the individual defendants in their "official capacities," a plaintiff has the burden of proving that

their actions were taken pursuant to an official, existing and unconstitutional municipal policy.

The U.S. Supreme Court recently acknowledged "that there are limited circumstances in which an allegation of a 'failure to train' can be the basis for liability under § 1983." *City of Canton, Ohio v. Harris,* 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). In *City of Canton,* the Supreme Court held that "the inadequacy of police training may serve as the basis for § 1983 liability *only where the failure to train amounts to deliberate indifference* to the rights of persons with whom the police come into contact." (Emphasis added). The Court made it clear, however, that "[o]nly where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality—a 'policy' as defined by our prior cases—can a city be liable for such a failure under § 1983." The Court further explained the character of proof required in such cases:

The issue in a case like this one, however, is whether that training program is adequate; and if it is not, the question becomes whether such inadequate training can justifiably be said to represent "city policy." It may seem contrary to common sense to assert that a municipality will actually have a policy of not taking reasonable steps to train its employees. *But it may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.* In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury.

In resolving the issue of a city's liability, the focus must be on adequacy of the training program in relation to the tasks the particular officers must perform. That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program.

\* \* \* \* \* \*

*Moreover, for liability to attach in this circumstance the identified deficiency in a city's training program must be closely related to the ultimate injury.* Thus in the case at hand, respondent must still prove that the deficiency in training actually caused the police officer's indifference to her medical needs. *Would the injury have been avoided had the employee been trained under a program that was not deficient in the identified respect?* Predicting how a hypothetically well-trained officer would have acted under the circumstances may not be an easy task for the factfinder, particularly since matters of judgment may be involved, and since officers who are well trained are not free from error and perhaps might react very much like the untrained officer in similar circumstances. But judge and jury, doing their respective jobs, will be adequate to the task.

489 U.S. at ——, 109 S.Ct. at 1205–06.

In *Gagne v. City of Galveston,* 671 F.Supp. 1130, 1134 (S.D.Tex.1987), the district court noted it to be "ironic" that even though the existence of an "official policy" is an integral prong of a municipal liability claim, the gravamen of plaintiff's complaint was that the City was deficient *in failing to establish such a policy* consisting of "departmental rules or regulations for screening suicidal persons," or rules for their regular and visual observation. These are the same claims advanced by the plaintiff herein. The court in *Gagne* recognized that

it might be possible to construe the defendants' conduct as an official policy not to promulgate such rules and regulations so that they can indirectly sanction the denial of medical care to pretrial detainees. *In order to presume such a hypothesis, the plaintiffs must specify or allege prior incidents where such conduct resulted in injury to other pretrial detainees. The reason for such specificity is simple. Absent persistent and widespread denial of medical at-*

*tention to other pretrial detainees, an isolated incident, as exists here, is insufficient to show that a custom exists.* (citations omitted). (Emphasis added). 671 F.Supp. 1135.

Although the above recognized requirement of showing prior incidents may not be a component of plaintiff's proof of causation under the *City of Canton* test, this court agrees that proof of such prior incidents is necessary in order to show "a *policy* of not taking reasonable steps to train its employees." *City of Canton, supra.* Without proof of such prior incidents, how can the need for more or different training become *so obvious,* to the City, or the inadequacy of existing training programs *so likely* to result in violations of constitutional rights such as to constitute a *deliberate indifference* where no additional steps are taken? It is pertinent to note that in her opinion concurring in part and dissenting in part in *City of Canton, supra,* Justice O'Conner, joined by Justices Scalia and Kennedy, would not have remanded that case to the Court of Appeals to determine whether the plaintiff should be given an opportunity to prove her case under the "deliberate indifference" rule adopted by the Court. Rather, Justice O'Conner applied that standard to the facts in that case, concluding as follows:

> Where, as here, a claim of municipal liability is predicated upon a failure to act, the requisite degree of fault must be shown by proof of a background of events and circumstances which establish that the "policy of inaction" is the functional equivalent of a decision by the city itself to violate the Constitution. *Without some form of notice to the city, and the opportunity to conform to constitutional dictates both what it does and what it chooses not to do, the failure to train theory of liability could completely engulf Monell, imposing liability without regard to fault.* Moreover, absent a requirement that the lack of training at issue bear a very close causal connection to the violation of constitutional rights, the failure to train theory of municipal liability could impose "prophylactic" duties on municipal governments only remotely connected to under-

lying constitutional requirements themselves.

> \* \* \* \* \* \*

> *Where a § 1983 plaintiff can establish that the facts available to city policymakers put them on actual or constructive notice that the particular omission is substantially certain to result in the violation of the constitutional rights of their citizens, the dictates of Monell are satisfied.* Only then can it be said that the municipality has made " 'a deliberate choice to follow a course of action ... from among various alternatives.' " *Ante,* [489 U.S.] at [——, 109 S.Ct. at 1205] quoting *Pembaur v. Cincinnati,* 475 U.S. 469, 483–484 [106 S.Ct. 1292, 1300, 89 L.Ed.2d 452] (1986).

> \* \* \* \* \* \*

> The claim in this case—that police officers were inadequately trained in diagnosing the symptoms of emotional illness—falls far short of the kind of "obvious" need for training that would support a finding of deliberate indifference to constitutional rights on the part of the city. As the Court's opinion observes, *ante,* [489 U.S.] [at ——, n. 8, 109 S.Ct. at 1204, n. 8] this Court has not yet addressed the precise nature of the obligations that the Due Process Clause places upon the police to seek medical care for pretrial detainees who have been *physically* injured while being apprehended by the police. *See Revere v. Massachusetts General Hospital,* 463 U.S. 239, 246 [103 S.Ct. 2979, 2984, 77 L.Ed.2d 605] (1983) (REHNQUIST, J., concurring). *There are thus no clear constitutional guideposts for municipalities in this area, and the diagnosis of mental illness is not one of the "usual and recurring situations with which [the police] must deal." Ante, [489 U.S.] at [—— – ——, 109 S.Ct. at 1206]. The lack of training at issue here is not the kind of omission that can be characterized, in and of itself, as a "deliberate indifference" to constitutional rights.*

(Emphasis added).

Plaintiff herein has neither specified nor alleged prior incidents of suicide, other

than Ike Evans, which establish that the deficiencies in training alleged resulted in those suicides. For that matter, plaintiff has not even established that had Ronnie Popham been observed as frequently as five times during an eight-hour period, or even more frequently than that, his suicide could have been prevented. As already noted, Ike Evans was observed five minutes before he was found hanging. *See also Gagne v. City of Galveston,* 671 F.Supp. at 1134, footnote 17:

> In light of the numerous instances of suicide by hanging that occur on a national basis, it would seem that heightened observation is not the answer to suicide prevention. *The reason is simple in that unconsciousness and death occur in a matter of minutes.*
>
> In those situations where the police have actual or constructive knowledge that the pretrial detainee might be suicidal, the better alternative appears to be to restrict the detainee's access to things like belts and shoelaces, which can be used to facilitate the hanging. Furthermore, the detainee may have to be confined to a straightjacket in order to prevent him from harming himself.

(Emphasis added).

In the present case, Ronnie Popham's belt and shoes were removed.[11] In short, plaintiff has not adduced substantial evidence that had the officers in question had training in screening and identifying suicidal individuals, any additional precautions would have been taken in Ronnie Popham's case. Indeed, defendants had a history with Popham of numerous prison incarcerations, in none of which did he exhibit unusual or suicidal tendencies. On these facts, the defendants were acting reasonably in relying on that history, and in taking the measures they did take in subduing Popham. Plaintiff has not shown that Popham's suicide would have been avoided had these defendants been further trained in suicide prevention. If the actions of the officers were, objectively viewed alone, not

deliberately indifferent, there is no causal relationship with any alleged failure to train.

The court therefore concludes that under the circumstances of this case, there is no evidence upon which to base a finding that any of these defendants acted with deliberate indifference to Ronnie Popham's taking of his own life or that there was any indifferent training or policy, custom, etc. which caused his death.

### IV. Section 1985 Claim.

In her complaint, plaintiff alleges, *inter alia,* that the defendants deprived Ronnie Popham of his rights, privileges and immunities as guaranteed and protected by the Fourteenth Amendment and 42 U.S.C. § 1983 *et seq., including § 1985.* However, plaintiff does not otherwise state a claim under § 1985 in which she alleges that the defendants conspired to interfere with Popham's civil rights. In their brief, defendants argue that there is absolutely no evidence that any of the defendants conspired to interfere with Popham's civil rights by (1) preventing an officer from performing his duties, (2) obstructing justice and (3) depriving persons of rights and privileges. Plaintiff does not respond in any fashion to defendants' argument with respect to any purported § 1985 claim. Thus, the court assumes that the plaintiff has abandoned any claim she might assert under § 1985. In any event, there is no evidence to support it.

Based on the foregoing, defendants' are entitled to summary judgment as to all of plaintiff's federal claims. The court declines pendent jurisdiction of the remaining claim for wrongful death under state law in view of the insubstantial nature of the federal claim(s). The statute of limitations has not run on the state claim. That claim is dismissed without prejudice for refiling same in state court.

An appropriate order will be entered.

---

11. Had the defendants had actual or constructive knowledge of his suicide attempt the previous week, perhaps they would have removed his jeans also.